BERNALE BRYANT *v.* COMMISSIONER OF
CORRECTION
(SC 17896)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and Schaller, Js.

Argued April 24, 2008—officially released March 10, 2009

*Peter Tsimbidaros*, for the appellant (petitioner).

*Michael E. O'Hare*, supervisory assistant state's attorney, with whom, on the brief, were *Gail Hardy*, state's attorney, and *David Zagaja*, assistant state's attorney, for the appellee (respondent).

*Opinion*

SCHALLER, J. The sole issue in this certified appeal is whether trial counsel for the petitioner, Bernale Bryant, rendered ineffective assistance by failing to present four independent witnesses whose testimony, the petitioner claims, would have supported a third party culpability defense and substantially impeached the evidence presented against the petitioner. The petitioner appeals from the judgment of the Appellate Court reversing the judgment of the habeas court, which had granted his petition for a writ of habeas corpus. On appeal, the petitioner claims that the Appellate Court improperly concluded that the performance of his trial counsel was

not deficient. The petitioner contends that the defense counsel's failure to present the witnesses constituted ineffective assistance of counsel, and that the habeas court properly rejected the argument of the respondent, the commissioner of correction, that it was a matter of trial strategy. We agree with the petitioner and reverse the judgment of the Appellate Court.

The Appellate Court's decision on direct appeal in *State* v. *Bryant*, 71 Conn. App. 488, 802 A.2d 224 (2002), sets forth the facts, as found by the jury, that led to the petitioner's conviction. "The jury reasonably could have found that on April 14, 1996, the [petitioner] repeatedly and seriously injured [the victim] Edward Jones, and those injuries caused Jones' death. . . .

"After drinking beer and using narcotics together, in the early morning hours . . . Gary Fournier and [Jones], drove to Irving Street and Albany Avenue in Hartford to get more narcotics. The pair planned to obtain the narcotics and drive off without paying for them. Fournier stopped his car and was approached by Terry 'T-Time' Davis, a known drug seller. Shortly thereafter, the [petitioner] approached the car and handed Fournier some cocaine.

"As soon as Fournier had the cocaine in hand, he drove off without paying for the contraband. The [petitioner] continued to hang onto the car as Fournier drove off. The [petitioner] released his hold of the car just as it ran through a stop sign and was struck by another automobile. The [petitioner] then went to Fournier's car, dragged Fournier from the car, pushed him to the ground and kicked him several times before running to the passenger's side of the car. The [petitioner] dragged Jones through the passenger window, and hit and kicked him repeatedly while he lay on the street. The [petitioner] then ran from the scene." Id., 490. Jones

subsequently was taken to the hospital, where he was pronounced dead.[1] Id., 491.

The petitioner was charged with murder in violation of General Statutes § 53a-54a. After a jury trial, the petitioner was acquitted of the murder charge, but was found guilty of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1). The petitioner appealed from the judgment of conviction to the Appellate Court, which affirmed his conviction.[2] See id., 488. Upon the Appellate Court's affirmance of his conviction, this court denied the petitioner's petition for certification to appeal. State v. Bryant, 261 Conn. 939, 808 A.2d 1133 (2002).

Subsequently, the petitioner filed a petition for a writ of habeas corpus alleging that his confinement was illegal because he had been denied the effective assistance of counsel. The petitioner based his claim principally on his trial counsel's failure to present four

[1] After an autopsy, the state's medical examiner, Arkady Katsnelson, concluded that the cause of Jones' death was blunt head trauma, and that the manner of death was homicide.

[2] On direct appeal, the petitioner claimed that: (1) the introduction at trial of a transcript of the testimony from the probable cause hearing of an eyewitness, Ewan Sharp, violated the petitioner's constitutional right of confrontation because he was unable to cross-examine Sharp as to the benefits that Sharp had received for his testimony; and (2) the trial court violated the petitioner's constitutional right to present a defense when it prohibited him from presenting extrinsic evidence at trial as to the benefits received by Sharp for his testimony at the probable cause hearing. See State v. Bryant, supra, 71 Conn. App. 489–90. Sharp's testimony potentially played a significant role at trial because, upon his arrest for robbery in 1999, he told the Hartford police department that he had witnessed the accident four years prior and had witnessed the petitioner repeatedly beating Jones. Id., 491. Thereafter, the petitioner was arrested for Jones' murder. Id. The Appellate Court rejected both of the petitioner's claims on direct appeal, concluding that the petitioner had a sufficient opportunity to cross-examine Sharp at the probable cause hearing and that the exclusion of the evidence of the benefits given to Sharp for his testimony constituted harmless error. Id., 492–97.

independent witnesses at trial whose testimony would have supported an alternative theory of the cause of Jones' death. That theory did not implicate the petitioner, but instead implicated a small group of unidentified Hispanic men with a gun traveling in a white automobile. Trial counsel did not present this third party culpability defense to the jury. More specifically, the petitioner alleged that counsel should have called the following witnesses to testify to support that theory: Thomas Davis, the driver of the automobile that was struck by Fournier's vehicle; Melissa Young-Duncan, an emergency medical technician who responded to the scene and assisted Jones; John Gartley, a second emergency medical technician who responded to the scene and assisted Jones; and Rene Fleury, Fournier's girlfriend, who spoke with Fournier shortly after the incident. The habeas court found that the petitioner had been denied effective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), because "the missing testimony could easily have led a jury to harbor a *reasonable doubt* as to the guilt of the petitioner." (Emphasis in original.) Accordingly, the habeas court set aside the petitioner's conviction, and ordered a new trial.

The respondent filed a petition for certification to appeal, which the habeas court denied. Thereafter, the respondent appealed to the Appellate Court, claiming, inter alia, that the habeas court: (1) abused its discretion by denying the petition for certification to appeal; and (2) improperly concluded that the petitioner's trial counsel was ineffective by failing to present a theory of defense that was not supported by forensic evidence or the petitioner's testimony. The Appellate Court agreed and reversed the judgment of the habeas court. *Bryant* v. *Commissioner of Correction*, 99 Conn. App. 434, 441–44, 914 A.2d 585 (2007). We granted the petitioner's petition for certification to appeal limited to

the following issue: "Did the Appellate Court properly reverse the habeas court's decision to grant the petitioner's writ of habeas corpus?" *Bryant* v. *Commissioner of Correction*, 282 Conn. 910, 922 A.2d 1098 (2007).

The following additional relevant facts found by the habeas court are necessary for our resolution of the petitioner's claim that he was rendered ineffective assistance of counsel. The habeas court heard testimony from the four witnesses whom the petitioner claims should have testified at trial: Davis, Young-Duncan, Gartley and Fleury. After hearing their testimony, the habeas court found that "[h]ad [these witnesses] testified at the petitioner's trial, it is reasonably probable that the jury could have found the following scenario to be true": Davis, a Marine Corps veteran and gunnery specialist, employed in the Hartford area as a security guard, was driving in a company vehicle the evening of April 14, 1996. As he approached the intersection of Albany Avenue and Irving Street, Davis heard gunshots and identified them as originating from a small caliber weapon, probably a .22 caliber pistol. Immediately thereafter, Davis observed a blue Ford Escort (Ford),[3] traveling in the wrong direction, exit from Irving Street, a one-way street, onto Albany Avenue. The driver of the Ford appeared to be slumped over the wheel. A white Cadillac or Lincoln, also traveling in the wrong direction on Irving Street, pursued the Ford. Davis' vehicle collided with the Ford. Immediately after the accident, he observed the white vehicle stop and a light skinned Hispanic man exit the rear passenger seat of the vehicle.[4] The man approached Davis' vehicle carrying an object in his hand, which Davis could not see. Having heard the gunshots and believing the neighborhood to be dangerous, Davis displayed his own firearm, upon which the man went back to the white vehicle and it

---

[3] It is undisputed that Fournier and Jones were the occupants of the Ford.

[4] As the habeas court noted, the petitioner is African-American.

departed. At no time did Davis observe anyone remove the occupants from the Ford; nor did he observe anyone beat or kick them. Prior to trial, the investigator who worked for the petitioner's trial counsel had contacted and interviewed Davis, who related these events to the investigator. Davis also reported the gunshot he heard to the Hartford police department, but the police did not include his statement in their incident report. The habeas court further found that Davis was available to be subpoenaed by either party at the original trial.

The court also found that a jury could have determined that Young-Duncan and Gartley are both experienced emergency medical technicians who were serving as an ambulance crew on the night of the incident. After receiving a call to assist at an automobile accident on the corner of Albany Avenue and Irving Street, they promptly arrived at the scene and provided the initial medical treatment to Jones. Both Young-Duncan and Gartley noticed what appeared to them, based on their training and experience, to be a gunshot wound to Jones' left temple. Specifically, they identified the wound as a gunshot wound based on its small size and round shape as well as what appeared to be a powder burn. Furthermore, on the other side of Jones' head, there appeared to be a powder burn that was consistent with an exit wound. Young-Duncan brought the gunshot wound to the attention of an unidentified Hartford police officer at the scene, who agreed that it appeared to be a gunshot wound.

The habeas court additionally found that a jury could have determined that Fleury, who was not at the scene but who was the owner of the Ford involved in the accident, spoke with Fournier after he had arrived home from the hospital. When she inquired about what had happened, Fournier told her that "there had been an incident with three Hispanic males and a gun."

The petitioner's trial counsel, David Smith, testified at the habeas hearing that he was aware of these four witnesses, and had reviewed all of their statements prior to the petitioner's trial. Smith testified that he decided not to "[create] a specter of manslaughter with a firearm" by presenting these witnesses for two reasons: (1) he determined that there was no evidence to support the theory of the involvement of a gunman because there was no forensic evidence of a gunshot wound; and (2) he did not want to introduce the possibility that a gun had been involved in the incident for fear that it might "increase the likelihood of a penalty range" for the petitioner. Smith offered this justification, however, to explain only his failure to call Young-Duncan and Gartley as witnesses.

As to Davis, Smith testified that he did not call him because Davis could not be located.[5] Smith also appeared to believe that Davis' testimony could not assist in the defense of the petitioner. Specifically, Smith testified that "Davis, although he was there [at the scene], his existence or nonexistence either way did not . . . hurt [the petitioner] because he didn't say he saw someone else do something. He didn't say he saw [the petitioner] do anything." As to Fleury, Smith testified that he did not present her testimony because "[s]he was not a witness to the case. . . . [S]he didn't have any impeachment knowledge or evidence that we could have used."

We begin with the applicable standard of review and the law governing ineffective assistance of counsel claims. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . .

---

[5] The habeas court found that Smith's investigator did locate Davis. Davis testified at the habeas hearing that he had been contacted by the trial counsel's investigator, and Davis testified that he told the investigator about the gunshot, the Hispanic males and the white vehicle.

The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Sastrom* v. *Mullaney*, 286 Conn. 655, 661, 945 A.2d 442 (2008).

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, supra, 466 U.S. 686. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution." *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 153, 662 A.2d 718 (1995). "As enunciated in *Strickland* v. *Washington*, supra, 687, this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Sastrom* v. *Mullaney*, supra, 286 Conn. 662.

The habeas court found the credibility of Davis, Young-Duncan, Gartley and Fleury to be "considerable and compelling" because all four were neutral witnesses who were not meaningfully impeached at the

habeas hearing.[6] As a result, the court found that "a jury likewise would have found their testimony to be credible and highly persuasive." On the basis of this testimony, and pursuant to *Strickland* v. *Washington,* supra, 466 U.S. 686, the habeas court concluded that "it was deficient performance on the part of trial defense counsel not to present this testimony at the petitioner's original trial," and that "it was harmful to the petitioner and constituted inadequate representation to avoid introducing available and credible evidence of a clearly exculpatory nature in an ill-advised effort to avoid any mention of a firearm." The court also concluded that, in the absence of the deficient performance by trial counsel, the exculpatory testimony of these four witnesses could have "induce[d] reasonable doubt in the minds of the jury" and, therefore, "the reliability of the petitioner's conviction has . . . been undermined."

On appeal, the Appellate Court concluded that the petitioner had failed to satisfy the performance prong under *Strickland* v. *Washington,* supra, 466 U.S. 687, because he could not demonstrate that his trial counsel's representation fell below an objective standard of reasonableness. Instead, the Appellate Court determined that trial counsel decided not to call the four witnesses as a matter of trial strategy and held that the habeas court had failed to accord any deference to Smith's tactical decision or his perspective at the time

---

[6] Specifically, the habeas court stated, "[a]t this point, the court needs to comment upon the credibility of the four missing witnesses. In brief, it is considerable and compelling. All four of these individuals are law-abiding citizens; there was no meaningful impeachment of their testimony at the habeas trial; and, none of the witnesses knew or were in any way acquainted or associated with the petitioner. They are completely disinterested, observant, qualified and dispassionate witnesses. All of them have appropriate training that would allow them to make the statements that they did. This court, being in the best position to judge the credibility of the proffered witnesses believes that a jury likewise would have found their testimony to be credible and highly persuasive."

of trial. *Bryant* v. *Commissioner of Correction*, supra, 99 Conn. App. 443–44. We disagree and conclude that the decision not to call these four witnesses was not a matter of sound trial strategy within the wide range of reasonable professional assistance.

We first address Smith's actions in light of the performance prong. "To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 525, 903 A.2d 169 (2006). "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. . . .

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;

that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." (Citations omitted; internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 688–90.

Accordingly, the question of whether Smith's actions fell below an objective standard of reasonableness turns on whether his decision not to solicit the testimony of the four witnesses to support the third party culpability defense can be considered sound trial strategy, or whether it constitutes a serious deviation from the actions of an attorney of ordinary training and skill in criminal law. We need not decide whether Smith's failure to elicit the testimony of any particular witness would suffice because *Strickland* directs us to look at the "totality of the evidence before the judge or jury"; id., 695; keeping in mind that "[s]ome errors . . . have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . ." (Internal quotation marks omitted.) *Lindstadt* v. *Keane*, 239 F.3d 191, 199 (2d Cir. 2001), quoting *Strickland* v. *Washington*, supra, 466 U.S. 695–96; see also *Pavel* v. *Hollins*, 261 F.3d 210, 228 (2d Cir. 2001) (cumulative weight of flaws deprived defendant of effective assistance of counsel). We therefore consider Smith's failure to present the mosaic of the alternative

theory, a third party culpability defense, as supported by the four witnesses.

We first review the standards governing the admissibility of third party culpability evidence, mindful that the petitioner cannot prevail unless he demonstrates that his alternative theory would not be excluded. "It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Internal quotation marks omitted.) *State* v. *Arroyo*, 284 Conn. 597, 609, 935 A.2d 975 (2007).

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 564, 747 A.2d 487 (2000). "Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." (Internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 625, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005); Conn. Code Evid. § 4-1. Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated: "Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt." (Internal quotation marks omitted.) *State* v.

*Smith*, 280 Conn. 285, 304, 907 A.2d 73 (2006). "In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt." *State* v. *Arroyo*, supra, 284 Conn. 609–10.

It is not ineffective assistance of counsel, however, to decline to pursue a third party culpability defense when there is insufficient evidence to support that defense. See *Dunkley* v. *Commissioner of Correction*, 73 Conn. App. 819, 827, 810 A.2d 281 (2002) (no evidence to support third party claim, in part, because no one at scene implicated alleged third party), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003); see also *Floyd* v. *Commissioner of Correction*, 99 Conn. App. 526, 531–32, 914 A.2d 1049 (insufficient evidence to substantiate third party claim when predicated on alleged testimony of unlocated drug dealers who were also gang members), cert. denied, 282 Conn. 905, 920 A.2d 308 (2007); *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 591–92, 867 A.2d 70 (third party statements did not contain sufficient substance to support viable third party claim), cert. denied, 273 Conn. 930, 873 A.2d 997 (2005); *Alvarez* v. *Commissioner of Correction*, 79 Conn. App. 847, 851, 832 A.2d 102 (insufficient evidence to support third party culpability defense when petitioner called only one witness at habeas hearing who did not even observe shooting), cert. denied, 266 Conn.

933, 837 A.2d 804 (2003); *Daniel* v. *Commissioner of Correction*, 57 Conn. App. 651, 684, 751 A.2d 398 (testimony not sufficient to raise third party culpability defense because supporting witnesses' statements were inconsistent), cert. denied, 254 Conn. 918, 759 A.2d 1024 (2000).

In contrast, in the present case, the habeas court found that the testimony of Davis, Young-Duncan, Gartley and Fleury would have worked in concert to create a credible scenario in which the cause of Jones' death was a gunshot wound to the head perpetrated by a small group of unidentified Hispanic males driving a white Cadillac or Lincoln, not the actions of the petitioner. First, Davis' testimony supports three assertions: (1) that prior to the collision, Davis heard a gunshot, possibly from a .22 caliber weapon; (2) that Jones' car was being pursued by a white Cadillac or Lincoln; and (3) that after the collision, an unidentified Hispanic man, with an unidentified object in his hand, exited the white vehicle and briefly approached the accident scene. Moreover, his testimony also undermines the state's theory of the case. Davis was present at the crime scene from the point of impact until the time the police arrived. Yet during that period, Davis did not witness the supposedly savage and deadly beating, which, according to the state's theory, occurred at the same accident scene.[7] Second, Young-Duncan and Gar-

---

[7] In referring to Jones, Davis responded to defense counsel's questions as follows during the habeas hearing:

"Q. Okay. Did you see anyone drag that person out of the vehicle?
"A. No, I did not.
"Q. Did you see anyone beat that person?
"A. No, I did not.
"Q. Did you see anyone kick that person?
"A. No, I did not.

\* \* \*

"Q. Okay. After the collision, did you remain conscious at all time[s]?
"A. Yes, I did.
"Q. Did you retain a clear line of vision to the other vehicle?
"A. Yes, I did."

tley were two trained emergency medical technicians. On the basis of their testimony, a jury reasonably could have concluded that Jones had sustained a gunshot wound to the left temple area of the head, and that the autopsy performed by the state's medical examiner, Arkady Katsnelson, was potentially incomplete or inaccurate. Finally, Fleury's testimony explicitly links the testimony of Davis, with that of Young-Duncan and Gartley. Fleury testified that when Fournier arrived home that night, he stated that he had been involved in "an incident with three Hispanic males and a gun."[8] Moreover, there was no evidence in the record to suggest that any of these witnesses' statements, regarding either the gunshot or the Hispanic males, were influenced by the statements made by the other witnesses regarding those similar observations. When reviewed in its totality, the testimony of these neutral witnesses, each of whom the habeas court found to be credible and highly persuasive, creates a plausible, well supported third party culpability defense. That is, the testimony of these four disinterested witnesses, when considered as a whole, raises more than a "bare suspicion" of third party culpability. *State* v. *Arroyo*, supra, 284 Conn. 610. Instead, the testimony directly connects a third party to the crime—the small group of unidentified Hispanic males.[9] We therefore conclude that under our third party culpability rules, the testimony tending to show that the unidentified Hispanic males with a gun were responsible for Jones' death would have been relevant to the jury's determination of whether there existed a reasonable doubt as to the petitioner's guilt. Therefore, the failure to present this relevant, plausible

---

[8] At the habeas hearing, Fleury testified that on the evening in question, Fournier also claimed he and Jones had been "beat up . . . ."

[9] There is no requirement that the petitioner specifically name the alleged third party perpetrator. See *State* v. *Echols*, 203 Conn. 385, 389, 393–94, 524 A.2d 1143 (1987) (trial court improperly excluded evidence of third party look-alike despite unknown identity).

third party culpability defense constituted deficient performance on the part of defense counsel under. *Strickland.*

In addition, we conclude that in circumstances that largely involve a credibility contest, as did the petitioner's trial, "the testimony of neutral, disinterested witnesses is exceedingly important." *Williams* v. *Washington,* 59 F.3d 673, 682 (7th Cir. 1995). While each habeas petition for ineffective assistance of counsel relies on its own unique set of facts, various state and federal decisions have addressed analogous circumstances. For example, in *Lindstadt* v. *Keane,* supra, 239 F.3d 203, the United States Court of Appeals for the Second Circuit concluded that the performance of the defendant's counsel was deficient, namely, because he failed to enter the testimony of two neutral probation officers who would have testified that the defendant's wife, who was the state's chief witness, had made numerous, unsubstantiated allegations of abuse against the defendant in the hopes of having him reincarcerated.[10] See also *Pavel* v. *Hollins,* supra, 261 F.3d 222–23 (in "credibility contest," performance deficient, in part, because of failure to call neutral court-appointed mediator to support theory that mother manipulated children's testimony in effort to gain full custody); *Siano* v. *Warden,* 31 Conn. App. 94, 100–105, 623 A.2d 1035 (in conviction based on credibility of testimony of coconspirator, deficient performance for failure to call physician as lone neutral witness to testify that defen-

---

[10] Interestingly, the other two aspects of the counsel's deficient performance in *Lindstadt* were the failure to show similar inconsistencies between the daughter's and the mother's testimony, and the failure to challenge the only medical evidence that supported the abuse, which was based on an unnamed study. *Lindstadt* v. *Keane,* supra, 239 F.3d 199–203. Similarly, in the present case, the testimony of Davis would have established inconsistencies with the eyewitness testimony of Fournier and Ewan Sharp, and the failure to offer the testimony of both Young-Duncan and Gartley, left unchallenged the principal medical evidence that supported the state's theory.

dant was incapable of crime due to extensive injuries from recent motor vehicle collision), cert. denied, 226 Conn. 910, 628 A.2d 984 (1993).

At trial in the present case, the state's only evidence that specifically connected the petitioner to the assault was predicated entirely on the credibility of the eyewitness testimony of Fournier and Ewan Sharp.[11] Fournier admitted that he had lied to the police during the investigation and that he had consumed approximately eighteen beers and an unknown quantity of cocaine on the night of the incident. Detective Steven Grabowski of the Hartford police department testified that, at the time, Fournier was "very uncooperative [and] intoxicated . . . ." A jury could have found that Sharp's testimony was equally suspicious. Sharp did not come forward until four years after the fact, and only while undergoing police interrogation for an unrelated felony. Moreover, the testimony of Fournier and Sharp was inconsistent as to critical facts: Fournier testified that the petitioner assaulted him in addition to attacking Jones, whereas Sharp testified that the petitioner did not assault Fournier. In the absence of the third party culpability evidence presented by neutral, credible witnesses, however, the jury was not presented with a plausible alternative to Sharp and Fournier's descriptions of the events.

In short, Smith's performance was deficient. The alternative theory raising a third party culpability

---

[11] We recognize that the strength of the state's case bears most significantly to our analysis under the prejudice prong of *Strickland*. The Supreme Court cautioned in *Strickland*, however, that "the principles we have stated do not establish mechanical rules." *Strickland* v. *Washington*, supra, 466 U.S. 696. With that guidance in mind, we further observe that inherent in an analysis of whether counsel's actions were deficient, in part, because of a failure to call neutral witnesses in a credibility contest, there must be some initial inquiry into whether such a contest in fact existed. Accordingly, we set forth only so much with respect to the credibility of the state's two eyewitnesses to establish that such a credibility contest was present at the petitioner's trial.

defense was well supported by neutral, credible witnesses,[12] whose statements were made contemporaneous to the events.[13] This was not an alternative theory concocted years later by a defendant in a jailhouse cell, unsupported by credible evidence. Under our third party culpability rules, we conclude that the evidence was relevant, and could have raised a reasonable doubt in the minds of the jury as to the petitioner's guilt. The testimony would have called into question the most basic elements of the state's case: (1) that the petitioner was the individual who killed Jones; and (2) that Jones died as a result of a beating. In the light of all the circumstances, including the dubious credibility of the state's two eyewitnesses, the decision not to present the third party culpability defense fell below an objective standard of reasonableness, and, therefore, constituted deficient performance under the principles enunciated in *Strickland*.[14]

---

[12] We also find it persuasive that the testimony of these four witnesses, three of whom were eyewitnesses and all of whom were independent, was not cumulative of the testimony of the only two witnesses presented by trial counsel as part of the petitioner's defense, namely, a police officer, who testified that there was a police substation near the scene of the incident from which outdoor camera footage requests were never made, and the petitioner himself, who testified as to his presence at the scene. No witnesses at trial testified about gunshots, the presence of a white car and the unidentified Hispanic males, or to a possible gunshot wound to Jones. Cf. *United States* v. *Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam) (witness would have corroborated another witness' testimony and counsel could have determined witness would have been unnecessarily cumulative), cert. denied sub nom. *Parise* v. *United States*, 526 U.S. 1164, 119 S. Ct. 2059, 144 L. Ed. 2d 224 (1999).

[13] Young-Duncan, Gartley and Fleury's statements were made to police on the day in question. While police also took Davis' statement on the day in question, that statement does not contain the statements regarding the circumstances surrounding the gunshot. Davis testified at the habeas hearing that the police were not interested in memorializing that portion of his account. He also testified that he told his full account to the petitioner's investigator. Moreover, Davis' original statement to police does not contain any account of an assault by the petitioner.

[14] The Appellate Court buttressed its conclusion that the petitioner did not satisfy the performance prong of *Strickland* because "[t]he petitioner

We are not persuaded by the state's argument that deference to trial strategy saves Smith's actions. While we acknowledge that the decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel; see *State* v. *Gore*, 288 Conn. 770, 779 n.9, 955 A.2d 1 (2008); it does not follow necessarily that, in every instance, trial counsel's strategy concerning these decisions is sound. As we have demonstrated previously in this opinion, in light of an objective standard, Smith's decision not to present these witnesses was unreasonable.[15]

---

did not indicate in either of his statements to the police, or in his testimony at his criminal trial, that there was an unknown gunman involved in the April 14, 1996 incident. Therefore, the presentation of a defense regarding an unknown gunman would have been rendered implausible by the petitioner himself. In fact, the [habeas] court noted that 'the petitioner's own testimony . . . seems to contradict the existence of [the] white Cadillac and a shooting . . . .' " *Bryant* v. *Commissioner of Correction*, supra, 99 Conn. App. 443. We disagree. Although the petitioner's trial testimony, and his statements to the police, do not reference a gunshot, a white vehicle or any Hispanic males, we do not view the absence of such information to be directly contradictory. If the petitioner had testified that there was no gunshot, that Jones had not been shot or that there was no white car in the area, that testimony would have been directly contradictory. It is possible, however, that the petitioner simply did not hear the gunshots or see the white vehicle and unidentified Hispanic males while he was hanging onto, or had just fallen off of, Fournier's Ford, which, according to Davis, was traveling between thirty-five and forty-five miles per hour. More importantly, as the habeas court noted, the petitioner may have chosen not to testify at all if these four witnesses had been presented at trial.

[15] We briefly address the explanations proffered by Smith at the habeas hearing to the extent that the Appellate Court relied on those explanations to conclude that Smith's action constituted reasonable trial strategy. Smith claimed that: (1) he did not want to introduce the witnesses because evidence of a gun may have increased the petitioner's penalty range; and (2) the testimony of a gunshot, as established by Young-Duncan and Gartley, was unsupported by other evidence. First, the state did not charge the petitioner with the use of a firearm. Moreover, because manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a is not a lesser included offense of murder when the information does not allege that the murder was, in fact, committed with a firearm; *State* v. *Greene*, 274 Conn. 134, 159–60, 874 A.2d 750 (2005), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006); Practice Book § 36-18 would likely have prohibited

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* v. *Washington*, supra, 466 U.S. 691. To satisfy the second prong of *Strickland*, that his counsel's deficient performance prejudiced his defense, the petitioner must establish that, as a result of his trial counsel's deficient performance, "there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal." *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 454, 610 A.2d 598 (1992), overruled in part on other grounds by *Small* v. *Commissioner of Correction*, 286 Conn. 707, 946 A.2d 1203 (2008). The second prong is thus satisfied if the petitioner can demonstrate that there is "a reasonable probability that, but for that ineffectiveness, the outcome would have been different." *Summerville* v. *Warden*, 229 Conn. 397, 430, 641 A.2d 1356 (1994); see also *Siano* v. *Warden*, supra, 31 Conn. App. 98.

Because the Appellate Court concluded that the petitioner had failed to satisfy the performance prong of *Strickland*, it did not reach the question of prejudice. The habeas court, for its part, concluded that, based on its findings, "there is clearly sufficient reason to doubt the reliability of [the jury's] verdict, based as it is upon incomplete evidence." We agree.

the state from amending the charges against the petitioner. See *State* v. *Ramirez*, 94 Conn. App. 812, 817, 894 A.2d 1032 (Practice Book § 36-18 provides that state may amend information after commencement of trial as long as "no additional or different offense is charged and no substantive rights of the defendant would be prejudiced" [internal quotation marks omitted]), cert. denied, 278 Conn. 915, 899 A.2d 612 (2006). Second, the testimony of Young-Duncan and Gartley, which established the possibility of a gunshot wound, was, in fact, supported by other witnesses, namely, Davis, who testified that he heard gunshots immediately prior to the collision and who thereafter witnessed an unidentified Hispanic man with an object in his hand, and Fleury, who testified that Fournier stated that he had been involved in an incident with "three Hispanic males and a gun."

Foremost, while it is not necessary to repeat our analysis addressing the performance prong, suffice it to say that the third party culpability defense, as supported by the testimony of Davis, Young-Duncan, Gartley and Fleury, likely would have permeated to some degree every aspect of the trial and raised a reasonable doubt in the minds of the jury as to the petitioner's guilt.[16] See *Strickland* v. *Washington*, supra, 466 U.S. 695–96 ("[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture"). That theory, when juxtaposed with the testimony of Fournier and Sharp, creates great doubt in the validity of the jury's verdict. See id., 696 ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").

As we previously have noted, in the present case, the only evidence directly connecting the petitioner to the attack was the eyewitness testimony of Fournier and Sharp. The record reveals, however, that both witnesses were subject to substantial impeachment evidence. First, Sharp never made a statement to police on the night of the incident, but rather made his statement four years later and only during an interrogation by the Hartford police department subsequent to an unrelated felony arrest. Only at that point did Sharp tell the police that he had witnessed the petitioner beating Jones.[17]

---

[16] We conclude that, even assuming that the use of Fleury's statement would be limited to impeachment purposes, pursuant to § 6-10 of the Connecticut Code of Evidence, the testimony of Davis, Young-Duncan and Gartley, coupled with that impeachment testimony, would have been sufficient to undermine the jury's verdict. Accordingly, and in light of the fact that Smith did not even attempt to introduce Fleury's statement, we need not reach the question of whether Fleury's statement would also have been admissible for substantive purposes. Rather, we leave that determination to the discretion of the trial court on remand.

[17] Sharp testified that he did not give a statement to the police on the night in question.

Sharp then testified at the petitioner's probable cause hearing in a manner largely consistent with the facts, as noted previously, that the Appellate Court relied on to reverse the habeas court. When it was Sharp's turn to testify at trial, however, Sharp refused. After the prosecutor offered Sharp transactional immunity, Sharp continued to refuse to testify and subsequently was held in contempt of court. Thereafter, the state read Sharp's probable cause testimony into the record. Second, at the time of the probable cause hearing, Sharp testified that he had four prior felony convictions, and had charges pending against him. Finally, Sharp testified that, at the time he allegedly witnessed the events, he was fourteen years old and was under the influence of marijuana.

Fournier's testimony was also vulnerable to impeachment evidence. To begin, on the night in question, Fournier also did not make any statements to police asserting that the petitioner had attacked Fournier or Jones. When police recontacted Fournier on or about February 21, 1997, he again failed to make any statements alleging an attack by the petitioner.[18] While on the witness stand, Fournier testified that he had at least one prior felony conviction and had various charges pending against him. In addition, Fournier admitted that at the time of the incident it was his and Jones' intention to solicit the sale of cocaine and depart without paying for the contraband. Even more remarkable, Fournier testified on cross-examination that he had consumed as many as eighteen beers and an unknown quantity of cocaine on the night of the incident. Fournier then testified that he had lied to the police on multiple occasions during their investigation, specifically, that he had been the passenger and not the driver of the Ford,[19]

---

[18] Fournier eventually testified in a manner consistent with the facts as noted by the Appellate Court.

[19] Fournier testified that he lied in order to avoid arrest for driving with a suspended license.

and that he had given a false name to the police to avoid arrest on an outstanding warrant. Most importantly, as noted previously, the testimony of Sharp and Fournier diverged in one significant respect: Fournier testified that the petitioner had kicked him several times prior to the petitioner's alleged beating of Jones, whereas Sharp testified that he witnessed the entire incident and that Fournier "didn't get beat up. He was down by the package store."

Accordingly, not only was the testimony that linked the petitioner to the attack of dubious credibility, it also was internally inconsistent with respect to significant facts. While Katsnelson's testimony and report admittedly were strong evidence, they were not conclusive of the petitioner's guilt. Without the jury crediting the testimony of Sharp and Fournier, Katsnelson's conclusion that Jones died of blunt trauma, assuming it is correct, only supports the conclusion that Jones died of blunt trauma—it does not prove that the petitioner committed the attack. Nothing in the autopsy report permitted Katsnelson to point to the petitioner as the assailant, nor did Katsnelson do so at trial. As a result, the failure to challenge the testimony of Fournier and Sharp with neutral, disinterested testimony was exceedingly damaging to the petitioner's defense.

Moreover, Katsnelson's testimony was not irrefutable. Though Katsnelson observed various injuries suffered by Jones that he concluded were inconsistent with a motor vehicle accident,[20] and testified that he did not find evidence of a gunshot wound,[21] the failure

[20] At the time of the autopsy, Katsnelson was under the belief that Jones had been the driver. As it later turned out, Jones was in fact the passenger.

[21] The habeas court addressed this conclusion by observing that "[i]t is not impossible that with the force of the impact of the collision, coupled with a gunshot wound to the head, and emergency treatment at the trauma center that a severe fracturing of the skull might have masked the existence of the gunshot wound by the time of the postmortem examination."

to call Young-Duncan and Gartley left Katsnelson's con-
clusion largely uncontested.[22] Without that testimony,
the jury never had to reconcile how two trained emer-
gency medical technicians observed a pencil sized entry
and exit gunshot wound to the head moments after
their arrival at the scene. Perhaps most importantly,
while it is difficult to understand how the autopsy did
not reveal a gunshot wound, it is equally difficult to
explain how Davis, a former Marine and disinterested
witness, who saw the entire incident, and testified that
at no time did he lose consciousness, never saw a sup-
posedly savage and deadly beating taking place in his
presence.

On the basis of the foregoing, we conclude that but
for the deficient performance of the petitioner's trial
counsel, there was a reasonable probability sufficient
to undermine confidence in the jury's verdict; *Strick-
land* v. *Washington*, supra, 466 U.S. 694; and, as a result,
the petitioner received ineffective assistance of counsel
in violation of his rights under the sixth and fourteenth
amendments to the United States constitution and arti-
cle first, § 8, of the Connecticut constitution.[23]

[22] It is important to remember that Katsnelson's bald assertion that he
"did not find any evidence of gunshot wounds" was never subjected to
scrutiny on cross-examination. For example, Katsnelson was never asked
whether he also had observed the wound that the two emergency medical
technicians (and an unidentified Hartford police officer) believed was a
gunshot wound, and, thus, never provided an explanation as to whether their
belief was correct or incorrect. While Smith did cross-examine Katsnelson on
his foundation, including: (1) his failure to assess the damage to the Ford;
(2) his failure to visit the scene; (3) his failure to perform an accident
reconstruction; and (4) his mistaken belief that Jones was the driver and
not the passenger, the inclusion of the exculpatory testimony would have
given the jury a strong basis to question Katsnelson's conclusion. We would
also note that, significantly, defense counsel's reasons for not presenting
these witnesses in the context of impeachment as well as a third party
culpability theory are inadequate and unsatisfactory. See footnote 15 of this
opinion. Defense counsel, who improperly feared introducing evidence of
a gunshot, failed to offer the obvious challenges to Katsnelson's report.

[23] The concurring opinion emphasizes that one of our two grounds for
reversing the judgment of the Appellate Court is that the testimony of the

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the habeas court.

In this opinion NORCOTT and VERTEFEUILLE, Js., concurred.

PALMER, J., with whom ROGERS, C. J., joins, concurring. I agree with the majority that, contrary to the determination of the Appellate Court, defense counsel rendered ineffective assistance of counsel in connection with his representation of the petitioner, Bernale Bryant, at the petitioner's trial for the murder of the victim, Edward Jones. I disagree with the majority, how-

four witnesses, Davis, Young-Duncan, Gartley and Fleury, who were not called by defense counsel, would have supported a viable third party culpability defense. On the basis that such a defense may have been "weak," the concurring opinion argues that failing to call the witnesses for that purpose was not ineffective assistance. While we disagree with the concurring opinion's characterization as to the strength of the third party defense, we also observe that the concurring opinion fails to note with appropriate emphasis that the other ground for reversal is that the failure to present those witnesses relinquished the opportunity for substantial impeachment of the state's case. Apparently, however, the concurrence is in accord on this ground, although it focuses solely on the testimony of one witness, Davis, whose absence alone, it argues, supports the showing of ineffective assistance of defense counsel. It is indisputable, in fact, that Davis is the principal witness whose testimony would directly support a third party culpability defense, as well as would impeach the testimony of various state's witnesses.

In response to the concurrence's conclusion that the majority opinion somehow "require[s]" future defense counsel to present a third party culpability defense or even that defense counsel will "be obligated" to raise it, we clarify that future defense counsel is by no means so "obligated" or "require[d]." Addressing the issue raised on appeal involves a retrospective view of the earlier trial and a determination that the failure to present the testimony of these exculpatory witnesses was not effective representation. The point is that defense counsel did not offer available evidence that would have countered both the state's claims that the petitioner was the assailant and that the victim was beaten to death. Defense counsel at a future trial, which, doubtless, will take place under substantially different circumstances, is free to proceed on the basis of his or her own assessment of the available evidence and, ultimately, his or her own judgment as to how to make use of this evidence.

ever, that defense counsel's performance was deficient due to his failure to present a third party culpability defense predicated on the theory that Jones had been shot to death by a small group of unidentified Hispanic males. In my view, the decision whether to raise a defense of third party culpability was a judgment call that counsel was entitled to make. I do believe, however, that defense counsel's performance was constitutionally deficient because of his failure to adduce the exculpatory eyewitness testimony of Thomas Davis, which directly refutes the state's theory that the petitioner beat Jones to death. I therefore concur in the result.

The majority opinion contains a recitation of the evidence presented by the state at the petitioner's murder trial, and that evidence need not be repeated in detail in this opinion. Suffice it to say that the state's evidence consisted primarily of the testimony of two purported eyewitnesses to Jones' murder, Gary Fournier and Ewan Sharp, both of whom claimed to have observed the petitioner kick and beat Jones to death after pulling him through the passenger side window of Fournier's car following an automobile accident involving Fournier's car and another vehicle at the intersection of Irving Street and Albany Avenue in Hartford at approximately 1:30 a.m. on April 14, 1996. The fact that Jones had been beaten to death was confirmed by Arkady Katsnelson, a state associate medical examiner who conducted an autopsy on Jones and testified that Jones had died of multiple blunt trauma wounds to the head, the result of repeated blows to the head and face. Katsnelson further explained that Jones had suffered extensive skull fractures, both to the upper portions and base of the skull, including six separate areas of impact on the right side of the skull.

The state's case against the petitioner was rather weak, primarily because both Fournier and Sharp were

readily impeachable. Fournier, who, along with Jones, traveled to the north end of Hartford for the purpose of obtaining some cocaine and then driving away without paying for it, had been drinking heavily and using drugs on the night in question. In fact, Fournier had consumed as many as eighteen beers and an unspecified amount of cocaine that evening. According to a detective who observed Fournier at the time, Fournier was highly intoxicated and incoherent. In addition, Fournier did not tell the police about the petitioner's alleged involvement in Jones' murder on the night that it occurred, and he did not do so when he was contacted by the police again nearly one year later. At the petitioner's trial, Fournier testified that he had a prior felony conviction as well as other pending charges. He further acknowledged that he repeatedly had lied to the police during the course of their investigation into Jones' death, and that he had given them a false name because of an outstanding arrest warrant against him.

Sharp, who was only fourteen years old at the time of Jones' murder, was equally vulnerable to impeachment. Sharp also made no statement to the police on the night of the murder, and he did not do so until approximately three and one-half years later. When he finally identified the petitioner as Jones' assailant, Sharp was being questioned by the Hartford police following his arrest on felony charges unrelated to Jones' murder. Sharp testified at the petitioner's probable cause hearing that he had four felony convictions and other pending charges, and that he had been using marijuana when he allegedly witnessed the petitioner kill Jones. Finally, Sharp refused to testify at the petitioner's trial, despite having been offered immunity by the prosecution, and the trial court therefore held him in contempt of court.[1]

---

[1] In view of Sharp's refusal to testify, and because he was subject to cross-examination at the probable cause hearing, the trial court permitted the state to introduce Sharp's probable cause testimony at the petitioner's trial.

Furthermore, the testimony of the two men was materially inconsistent. Specifically, Fournier testified that the petitioner had assaulted him before attacking Jones; in marked contrast, Sharp testified that he had witnessed the entire incident and that Fournier never had been assaulted. In fact, according to Sharp, Fournier was at a nearby package store when he claimed to have been beaten by the petitioner. Thus, the testimony presented by the state to establish that the petitioner had killed Jones was, at best, suspect.

The only other evidence directly linking the petitioner to the incident consisted of two statements that the petitioner had given to the police and his trial testimony. According to the petitioner's statements and testimony, he was present, leaning up against Fournier's car, when Fournier was attempting to obtain a quantity of cocaine from a local drug dealer. As Fournier began to drive away, the petitioner, whose arm had been resting inside the car door, instinctively held on to the car and was dragged toward the intersection. The petitioner let go of Fournier's car before it reached the intersection, where it collided with Davis' vehicle. Although the petitioner saw Jones lying on the ground, bleeding, following the accident, the petitioner left the area when he saw other people, including paramedics and security personnel, arrive at the scene.

It is against this evidentiary backdrop that the habeas court, following a trial on the petitioner's sixth amendment claim, concluded that defense counsel had rendered ineffective assistance by failing to present four witnesses, namely, Davis, Melissa Young-Duncan, John Gartley and Rene Fleury, whose testimony, taken together, provided the basis for a viable third party culpability defense. Each of these witnesses testified at the habeas trial, and the habeas court expressly credited their testimony. In the habeas court's view, defense counsel's failure to present the third party culpability

defense through the testimony of those witnesses was constitutionally deficient because that defense "may well have led a jury to find reasonable doubt as to the petitioner's guilt."[2] In reaching its conclusion, the habeas court rejected the claim of the respondent, the commissioner of correction, that defense counsel reasonably could have elected not to present a third party culpability defense as a matter of trial strategy.

The habeas court based its determination concerning the significance of that defense on the following testimony of the four witnesses. Davis, a veteran of the United States Marine Corps who had served as a gunnery specialist, was employed as an "armed patrol officer" for Metro Loss Prevention Services on the night of the incident. While operating a company vehicle that night, he approached the intersection of Albany Avenue and Irving Street and heard what he believed were gunshots, probably from a small caliber weapon. As he headed down Albany Avenue, Davis observed a vehicle, later identified as the blue Ford Escort occupied by Fournier and Jones, traveling in the wrong direction on Irving Street, a one way street. Davis expected the Escort to turn right onto Albany Avenue, but it did not do so. Instead, the Escort struck Davis' vehicle, pinning Davis inside. Within seconds after the collision, Davis observed a white Cadillac or Lincoln, occupied by the driver and a back seat passenger, also headed the wrong way down Irving Street, immediately behind the Escort. According to Davis, that vehicle stopped, and the passenger, a light-skinned Hispanic male, got out of the car and walked toward Davis. The man had something in his hand that Davis could not identify. Concerned that the man might be armed, Davis drew a weapon

---

[2] The habeas court also observed that, in light of the credible evidence of the third party culpability defense, "there is clearly sufficient reason to doubt the reliability of [the jury's] actual verdict, based as it is [on] incomplete evidence."

that he had on his person, and the man fled. The white Cadillac or Lincoln headed westbound on Albany Avenue and did not return. Security personnel responded to Davis' radio call for assistance and arrived at the scene within one minute of the collision.

Davis observed one of the occupants of the Escort get out of the vehicle, stumble toward a nearby package store and sit down. Davis did not observe the other occupant leave the Escort. Despite his close proximity to the Escort, Davis did not see anyone drag either occupant of the Escort out of the vehicle, and he did not observe anyone kick or beat either of the two occupants. Prior to trial, defense counsel's investigator located and interviewed Davis, who told the investigator everything that he had witnessed that night.

On April 14, 1996, Young-Duncan and Gartley both were employed by L and M Ambulance Service. At approximately 1:30 a.m. on that date, their ambulance was dispatched to the accident at the intersection of Irving Street and Albany Avenue. Young-Duncan, who, at the time, had been an emergency medical technician for about two and one-half years, observed a man, later identified as Jones, lying in a fetal position near the Escort. When she examined him, she observed a wound on his left temple that was a "perfectly round hole and . . . the same size as a sharp weapon or a bullet." She also observed what appeared to be "black residue around [the] entry." On the basis of these observations, Young-Duncan believed that the wound was a gunshot wound. In testifying about her training as an emergency medical technician prior to the incident in question, Young-Duncan indicated that gunshot wound identification was not among the areas in which she received specialized training.

Gartley, a paramedic with approximately fifteen years of experience at the time of the incident, testified

that he also attended to Jones. In doing so, he observed a "small, circular-type hole" on Jones' left temple that appeared to be a gunshot wound. Gartley also noticed "some black residue around the hole, possibly . . . like a powder burn, or something to that effect from a close-range shot." Although he saw "something that seemed to be another wound consistent with what might have been an exit wound" on his scalp, Gartley acknowledged that, "under the circumstances, it was too hard to tell" whether, in fact, it was an exit wound. Gartley also observed that Jones had suffered numerous other serious facial and head injuries, including multiple contusions and swelling, and that he was bleeding from the injuries to his head. In addition, Gartley saw "what appeared to be a boot print" on Jones.

In April, 1996, Fleury was engaged to Fournier and shared an apartment with him. When she awoke at approximately 5:30 a.m. on April 14, 1996, Fournier was not there. She did not see him until he visited her place of employment, Denny's Restaurant in East Hartford, sometime after she began work at 7 or 8 a.m. that day. Fournier told her that he had been in an automobile accident earlier that morning. Because Fournier was bruised and cut, Fleury left work and took Fournier home. When they arrived there, Fleury asked Fournier what had happened, and Fournier said something about "three Spanish guys with a gun . . . ." Fournier also explained that he and the other person in the car, Jones, "got beat up . . . ." According to Fleury, "that was pretty much all [she] ever got out of him."

Finding the testimony of these four witnesses to be "considerable and compelling," and that "a jury likewise would have found their testimony to be credible and highly persuasive," the habeas court concluded that it was "clear that the missing testimony could easily have led a jury to harbor a *reasonable doubt* as to the guilt of the petitioner. Consequently, it was deficient perfor-

mance on the part of . . . defense counsel not to present this testimony at the petitioner's original trial." (Emphasis in original.) The habeas court rendered judgment granting the habeas petition, setting aside the petitioner's conviction and ordering a new trial.

On appeal, the Appellate Court reversed the judgment of the habeas court; *Bryant* v. *Commissioner of Correction*, 99 Conn. App. 434, 444, 914 A.2d 585 (2007); concluding that defense counsel reasonably had rejected a third party culpability defense. See id., 440–44. The Appellate Court set forth a number of reasons in support of its conclusion: (1) defense counsel reasonably had decided not to "introduce evidence of a gun for fear of introducing a firearm at the scene, lest it be attributed to the petitioner, thereby increasing the sentence he might receive"; id., 443; (2) "the presentation of a defense regarding an unknown gunman would have been rendered implausible by the petitioner himself" because the petitioner never mentioned a gunman or gunshots in either of the two statements that he had given to the police or in his trial testimony; id.; and (3) the testimony of Young-Duncan and Gartley was unsupported because "[n]o other witness indicated the presence of a gun at the scene, including the petitioner," and any suggestion that Jones had died of a gunshot wound was directly contradicted by Katsnelson's testimony and report, both of which established definitively that Jones had died of blunt trauma to the head. Id.

The majority disagrees with the Appellate Court, however, concluding that the habeas court correctly determined that defense counsel's performance was prejudicially deficient in that he had failed to present the testimony of Davis, Young-Duncan, Gartley and Fleury, which, according to the majority, "would have worked in concert to create a credible scenario in which the cause of Jones' death was [not the petitioner but, rather] a gunshot wound to the head perpetrated by a small

group of unidentified Hispanic males driving a white Cadillac or Lincoln . . . ." I believe that the majority, in reaching this conclusion, (1) places too little weight on the overwhelming forensic proof that Jones was killed by repeated and severe blows to the head, and not by a gunshot, (2) improperly relies on the hearsay testimony of Fleury without explaining why it would be admissible, (3) ignores the two voluntary statements that the petitioner had provided to the police, neither of which contains any mention of gunshots or a shooting, even though the petitioner claimed that he was clinging to Fournier's car at or about the time that Jones, who was seated in that same car, purportedly was shot at close range by a small group of Hispanic males, and (4) affords defense counsel too little leeway with respect to the decision of whether it would be beneficial for the petitioner to testify in his own behalf.[3]

Before elaborating on why I disagree with the majority's conclusion that defense counsel rendered ineffective assistance of counsel in failing to present the third party culpability defense, I turn first to the reason why I believe, nevertheless, that defense counsel's performance was constitutionally deficient.[4] I reach this con-

---

[3] Of course, ultimately, the decision whether to testify rested with the petitioner, not defense counsel. See, e.g., *State* v. *Gore*, 288 Conn. 770, 779 n.9, 955 A.2d 1 (2008) ("[t]he fundamental rights that a defendant personally must waive typically are identified as the rights to plead guilty, waive a jury, testify in his or her own behalf, and take an appeal"). As a general matter, however, most such decisions are made jointly, with a defendant relying heavily on counsel's informed advice. In the absence of any indication to the contrary, I presume that that is what happened in the present case.

[4] It is well established that, under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a claim of ineffective assistance of counsel "must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. [Id.], 688, 694. The first prong requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the [s]ixth [a]mendment. . . .

clusion because Davis would have testified, credibly, that he was at the scene when Fournier and Sharp purportedly witnessed the petitioner beat Jones to death, and that Davis himself never saw anyone attack or assault Jones, then or at any other time. This testimony corroborates the petitioner's own statements and testimony that he did not assault Jones, and directly contradicts the testimony of Fournier and Sharp, who, as I previously explained, were highly impeachable. Because Davis' testimony is unassailable and casts grave doubt on the only evidence that the state adduced implicating the petitioner in Jones' murder, Davis' testimony would have undermined the state's already tenuous case against the petitioner. Finally, defense counsel had no countervailing reason not to call Davis as a witness.[5]

"[Furthermore] [i]n any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . Additionally, [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . [Moreover], a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 63, 951 A.2d 520 (2008).

[5] At the habeas trial, Davis testified that he had been interviewed by defense counsel's investigator. Davis further testified that he told the investigator that he had not seen an altercation of any kind following the accident on April 14, 1996. Moreover, although defense counsel testified at the habeas trial that he had been unable to contact Davis prior to the petitioner's criminal trial because Davis did not respond to repeated telephone calls and notes, the habeas court expressly found that "Davis was available to be subpoenaed by either of the parties to the original trial had they done so." Thus, Davis' testimony was exculpatory, and he was available.

I note that defense counsel also testified that Davis' "existence or nonexistence, either way, did not . . . hurt [the petitioner] because [Davis] didn't

Under the circumstances, his failure to do so cannot be justified and clearly prejudiced the petitioner by depriving him of evidence that was severely damaging to the state's case.[6]

For several reasons, however, I disagree that defense counsel's failure to present a third party culpability defense constituted ineffective assistance in violation of the sixth amendment. First, that defense is predicated on the assumption that Jones had been shot to death, and that he had not been killed by blunt force trauma to the head. The evidence to the contrary, however, is absolutely overwhelming. Katsnelson, an associate medical examiner, performed an autopsy on Jones, and his detailed and thorough report of that two and one-half hour postmortem examination was provided to both parties.[7] In the section of the report entitled "Evidence of Injury," Katsnelson identifies numerous contusions, lacerations and abrasions on Jones' head and neck, including a laceration of his "right eyeball," multiple contusions and abrasions on Jones' left hand and fingers, contusions on Jones' right knee and right wrist, and abrasions and contusions on Jones' pelvis and

say he saw someone else do something. He didn't say he saw [the petitioner] do anything." It appears that this testimony represents defense counsel's explanation as to why, in defense counsel's view, the failure to call Davis as a witness was not harmful to the petitioner. That failure was, in fact, very prejudicial to the petitioner because Davis' testimony that he had observed no altercation at the scene of the accident contradicted the highly incriminating testimony of Fournier and Sharp.

[6] Of course, Davis' testimony would not have provided an alternative theory or explanation as to who had beaten Jones to death, or precisely when. Davis' testimony, however, was extremely important, first, because it demonstrated that Jones' murder did not occur as Fournier and Sharp had described it and, second, because it corroborated the petitioner's contention that he did not kill Jones.

[7] The report indicates that John Mazzamurro, an inspector with the office of the state's attorney in the judicial district of Hartford, and Detective Edwin Soto of the Hartford police department were present when the autopsy was performed.

chest.[8] That section of the report also notes at least six areas of impact on the right side of the head and neck. The section of the report entitled "Head and Brain," which is similarly detailed, reveals that Jones suffered multiple and extensive skull fractures and lacerations, as well as considerable hemorrhaging. In addition, the

[8] The care with which Katsnelson examined Jones' body is reflected in the following verbatim recitation of that portion of the autopsy report entitled "Evidence of Injury": "A dark blue contusion is located in the frontal area of the head on the right side measuring up to 7 x 2 cm. with superficial abrasions, the largest of which measures up to 2 cm. An extensive abrasion is located in the right parietotemporal region of the head in an area which measures up to 12 cm. in greatest dimension. A laceration is noted on the upper aspect in the area of the connection of the right ear. This laceration measures up to 2.2 cm. A contusion and superficial abrasion is also present on the upper aspect of the right ear measuring up to 1.2 cm. A dark blue contusion is noted on the right side of the face involving the right upper and lower eyelids measuring 11 x 5.3 cm. On the surface of this contusion, there is also a superficial abrasion which is 3 x 0.2 cm. The right eyeball is lacerated. Dark blue hemorrhage is noted in the lower left eyelid measuring 2.5 x 0.5 cm. Palpation of the facial bones reveal[s] fractures of the maxilla. A dark red abrasion is noted on the upper aspect of the neck on the left side measuring up to 5 cm. in greatest dimension, and it is mostly horizontally oriented. There is an extensive abrasion with downward directions noted on the left lateral aspect of the chest. This abrasion measures 26 cm. vertically by 10 cm. horizontally. A superficial dark red abrasion is also noted on the left lateral aspect of the pelvis measuring up to 2.5 cm. in greatest dimension. There is [a] dark red abrasion located on . . . the posterior aspect of the chest in the upper part measuring 9 cm. in greatest dimension. This abrasion is surrounded by a contusion which measures up to 12 x 6 cm. A dark blue contusion is located in the posterior aspect of the right knee measuring up to 9 cm. in greatest dimension. There is a blue contusion located on the base of the second right finger measuring up to 2 cm. Below this contusion is a superficial abrasion measuring 1.5 cm. in greatest dimension. In the area of the right wrist on the dorsum there is a blue contusion noted measuring up to 2 cm. On the dorsum of the left hand and fingers multiple bluish contusions and abrasions are noted, the largest of which measures up to 4 cm. in greatest dimension. The contusion on the posterior aspect of the right knee reveals a grayish-green discoloration. Examination of the injuries of the head reveals at least six separate areas of impact located on the right side of the head, the right side of the neck, in the temporoparietal regions of the head and in the area of the right eye.

"An incision is made on the posterior aspect of the chest in the area of the abrasion/contusion, and a dark red hemorrhage is present in the soft tissue measuring 10 cm. in vertical dimension and 4 cm. deep."

section of the report entitled "Internal Examination" indicates that Jones had suffered three fractured ribs, with hemorrhaging in the surrounding soft tissue. Finally, the report sets forth Katsnelson's "[a]natomic [d]iagnoses," namely, "multiple extensive skull fractures," "subdural and subarachnoidal hemorrhage," "contusions and lacerations of the brain," "fracture of the fifth and sixth ribs on the left side," "contusion of the left lung," and "fracture of the first right rib." On the basis of Katsnelson's postmortem examination, he concluded that the cause of death was blunt force trauma to the head, and that the manner of death was homicide. In view of the painstakingly thorough internal and external examination that Katsnelson conducted on Jones' body, it is well-nigh inconceivable that he could have missed evidence establishing that Jones had been killed by a gunshot. Moreover, there is absolutely no doubt about the severity of Jones' head injuries, which included multiple and extensive skull fractures, and that he could not have possibly survived them.[9]

Furthermore, at the probable cause hearing, Katsnelson testified with respect to the autopsy that he had performed on Jones. According to Katsnelson, an examination of "every part of the body is important for [a] medical examiner, if there is any positive findings or negative findings. . . . [D]uring my examination of [Jones'] body, I found multiple areas of contusions on the face, in different parts of the face. Also there [were] contusions in the area of the head, [a] contusion on the neck, contusions on the back of the body, and there [were] also some superficial abrasions on the body. *I did not find any evidence of gunshot wounds, for example.* There was no evidence of stab wounds on the body. . . . All these injuries which I found [were]

---

[9] The magnitude of Jones' head injuries, which are depicted in the exhibits introduced by the state at the petitioner's criminal trial, is obvious even to the lay observer.

consistent with blunt force injury." (Emphasis added.) Defense counsel was present during Katsnelson's testimony at the probable cause hearing.

Despite the clarity and conclusions of Katsnelson's report and his probable cause hearing testimony, defense counsel testified at the habeas trial that he interviewed Katsnelson in advance of trial, and that he also had reviewed the hospital records relating to Jones' treatment immediately following the incident. On the basis of Katsnelson's statements and testimony, and defense counsel's review of the autopsy report and Jones' hospital records, defense counsel testified that it was apparent that "there was no [gunpowder] stippling . . . or gunshot residue on [Jones'] head . . . . There was no indication of an entrance wound or an exit wound, and there was no ricocheting or chipping of the bones indicating a bullet had ever been in the brain, and, finally, there was no lead or fragmentation found inside [Jones' head]." Because it was very evident that Jones' cause of death was blunt force trauma, defense counsel elected not to present a defense predicated on the theory—categorically refuted by the uncontradicted forensic evidence—that Jones had died of a gunshot wound.

Finally, at the petitioner's trial, Katsnelson testified that he graduated from medical school in 1957, that he has served as a medical examiner with the office of the chief medical examiner since 1983, and that he performs approximately 250 to 270 autopsies each year. Katsnelson further testified that an autopsy is the examination of a deceased person for the purpose of determining the cause and manner of death. Thus, in conducting the autopsy, which consists of a thorough external and internal examination of the body and all of its organs, the examining physician must determine why the decedent died, that is, whether death was caused by a gunshot wound, a stab wound, blunt force trauma or

something else. Katsnelson thereafter provided a detailed explanation of the findings of his postmortem examination of Jones. Consistent with the autopsy report, Katsnelson explained that the examination revealed that Jones had suffered multiple and extensive blunt force trauma wounds to the head, and that those wounds had caused Jones' death. Katsnelson further explained that the lethal wounds that Jones had sustained were not caused by a car accident because they were not consistent with the kind of wounds that a person would sustain in such an accident.

In light of the autopsy results, Katsnelson's testimony and defense counsel's interviews with Katsnelson, defense counsel reasonably concluded that he could not make a credible showing that Jones had died of a gunshot wound despite the testimony of Young-Duncan and Gartley. This conclusion was appropriate for two primary reasons. First, the defense that Jones was shot to death by a small group of Hispanic males does not account for the blunt force trauma injuries that Jones had suffered as a result of multiple blows to the body and, in particular, the head. Indeed, the majority does not even attempt to explain how those injuries are consistent with the theory that Jones was killed by a bullet rather than by repeated blows to the head. The majority also does not dispute the lethal nature of the blows that Jones had suffered. In asserting nevertheless that defense counsel was required to present a third party culpability defense, the majority simply ignores the fact that Jones was severely and brutally beaten, and that the beating he suffered caused his death.

Defense counsel's decision to reject the third party culpability defense also was reasonable because Katsnelson, a trained and experienced medical examiner whose sole task was to determine how and why Jones had died, conducted a thorough internal and external examination of Jones' entire body, including his head,

skull and brains, and found clear and incontrovertible evidence that Jones had died of blunt force trauma to the head. Katsnelson found no evidence of a gunshot wound.[10] Indeed, as defense counsel learned, Katsnelson's forensic examination of Jones' body, which was witnessed by an inspector from the office of the state's attorney and a Hartford detective, had revealed no gunpowder residue on Jones' head, no evidence of an entrance or exit wound, no damage to Jones' brain that might have been caused by a bullet and no trace of any substance within Jones' skull suggesting the presence of a bullet. Katsnelson, a physician trained and experienced in conducting postmortem examinations, had thoroughly examined Jones under optimal conditions and found no evidence of a gunshot wound, whereas

---

[10] The majority, quoting approvingly from the decision of the habeas court, proffers the following explanation as to why the jury might have been persuaded, despite the autopsy report and Katsnelson's testimony, that Jones could have been killed by a gunshot: "[I]t is not impossible that with the force of the impact of the collision, coupled with a gunshot wound to the head, and emergency treatment at the trauma center . . . a severe fracturing of the skull might have masked the existence of the gunshot wound by the time of the postmortem examination." (Internal quotation marks omitted.) Footnote 21 of the majority opinion. I respectfully submit that this assertion is based on nothing more than conjecture and speculation; it certainly is not supported by any testimony or other evidence. Indeed, photographs of Jones taken prior to the autopsy belie the contention that Jones' physical condition was so bad that Katsnelson reasonably could have failed to notice (1) gunpowder residue on Jones' head, (2) wounds on Jones' head where a bullet entered and then exited his head, (3) signs of the path made by the bullet as it traveled into and through Jones' head, and (4) bullet traces inside Jones' skull. In fact, if the petitioner had sought to establish that Jones' condition "might have masked the existence of the gunshot wound by the time of the postmortem examination"; (internal quotation marks omitted) id.; then he could have elicited testimony to that effect from a physician or other expert with experience and expertise in such matters. The majority's attempt to fill that evidentiary gap for the petitioner is unavailing, first, because there is nothing in the record to suggest that Jones' body was in unusually bad condition when it was delivered to the office of the chief medical examiner and, second, because there is nothing in the record to support the conclusion that Katsnelson, a trained and experienced medical examiner, somehow was unable to determine Jones' cause of death.

Young-Duncan and Gartley made their observations hurriedly, in the dark of night, while trying to save Jones' life. Thus, it was perfectly logical for defense counsel to reject the third party culpability defense that the majority concludes he was required to present.[11] The fact that the third party culpability defense reasonably might be deemed both unwise and unnecessary is buttressed by the availability of Davis' compelling testimony demonstrating that Jones was not murdered in the manner posited by the state's key witnesses, Fournier and Sharp.

This conclusion is not undermined by Fleury's testimony about Fournier's statement to her concerning "three Spanish guys with a gun . . . ." Although I do not believe that this rather vague statement is particularly significant, even if it were, it is classic hearsay and, therefore, inadmissible unless it falls within a recognized hearsay exception. The majority has not identified any such exception, and I am aware of none.

In addition, the petitioner voluntarily provided two statements to the police, both of which were admissible against him. In neither statement, however, did the petitioner make any reference to a shooting or to gunshots. Because the petitioner, by his own admission, was present at the scene when, in accordance with the third party culpability defense, Jones purportedly was shot in an altercation with "three Spanish guys," the petitioner's failure to mention gunshots to the police obviously

---

[11] I therefore disagree with the majority's unsupported assertion that Young-Duncan's and Gartley's testimony "would have given the jury a strong basis to question Katsnelson's conclusion." Footnote 22 of the majority opinion. Contrary to the assertion of the majority, Katsnelson's testimony, coupled with the multiple blunt force head injuries that Jones had suffered, compels the opposite conclusion: Young-Duncan and Gartley's good faith belief, based on their observation of Jones under emergency conditions in the middle of the night, that Jones may have been shot is wholly untenable in light of the undisputed forensic and medical evidence establishing that Jones had died of repeated blows to the head, and that he had not been shot.

is damaging to that defense. Naturally, the jury would wonder why the petitioner had failed to report hearing such gunshots, fired so close to the petitioner, if, in fact, those shots had been fired. Of course, defense counsel was entitled to consider that fact in deciding whether to raise a third party culpability defense.

Finally, I do not believe that the majority's conclusion gives sufficient weight to the strategic decision of having the petitioner testify at trial. The petitioner's trial testimony was consistent with the two statements that he previously had provided to the police, and, therefore, the decision was made that the petitioner would testify. Defense counsel reasonably may have concluded that the jury would like to hear from the petitioner—and view him favorably for taking the stand—despite his constitutional right to refrain from doing so. Raising a third party culpability defense, however, would make it less likely that the petitioner would elect to testify because that trial testimony, which presumably would not include any reference to a third party shooting even though the petitioner was at the scene when that shooting purportedly took place, would undermine the defense. Thus, to the extent that it may have been beneficial for the petitioner to testify at trial, raising a third party culpability defense would have made that testimony far more problematic. Defense counsel also was entitled to weigh that consideration in deciding not to raise a third party culpability claim.

In sum, I believe that defense counsel's failure to call Davis as a witness violated the petitioner's constitutional right to the effective assistance of counsel. As I have explained, there was no reason, strategic or otherwise, not to call Davis as a witness as Davis' credible testimony directly contradicted the testimony of the state's two key witnesses. I do not believe, however, that defense counsel also was required to present a third party culpability defense. A competent defense

attorney reasonably could have concluded that Davis' testimony, coupled with Fournier's and Sharp's lack of credibility, was likely to give rise to a reasonable doubt as to the petitioner's guilt. It also would have been reasonable for defense counsel to conclude that raising a third party culpability defense would have reduced the possibility of an acquittal by causing the jury to focus unduly on that defense—which, as I have explained, was extremely weak—instead of the state's marginal case against the petitioner.[12] I therefore concur in the result.

---

[12] Unfortunately, unless there is a material change of circumstances at the time of the petitioner's retrial, counsel for the petitioner at that retrial will be obligated to present a third party culpability defense—the majority opinion would require counsel to do so—despite the fact that Davis' testimony, standing alone, would undermine the state's case, and notwithstanding the fact that the third party claim ultimately is unconvincing. Moreover, the likelihood of a material change of circumstances is not great because the offense took place more than twelve years ago, and all of the witnesses already have testified under oath. If, in fact, there is no such change in circumstances, for the reasons that I have set forth in this opinion, I disagree with the majority that defense counsel should be required to present a third party culpability defense.