******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JORGE SANCHEZ *v.* COMMISSIONER OF
CORRECTION
(SC 19080)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued April 25—officially released December 2, 2014*

*Michael J. Culkin*, assigned counsel, for the appellant (petitioner).

*Linda Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Gerard Eisenman*, former senior assistant state's attorney, for the appellee (respondent).

*Opinion*

PALMER, J. The dispositive issue raised by this appeal is whether the habeas petitioner, Jorge Sanchez, has demonstrated that he received ineffective assistance of counsel at his criminal trial for murder and other offenses because his counsel failed to call two witnesses whose testimony would have contradicted that of an important state's witness regarding the petitioner's motive to commit those offenses. The petitioner appeals from the judgment of the Appellate Court dismissing his appeal from the habeas court's judgment denying his amended petition for a writ of habeas corpus. The Appellate Court dismissed the appeal after concluding that the habeas court did not abuse its discretion in denying the petitioner's request for certification to appeal in accordance with General Statutes § 52-470 (g).[1] *Sanchez* v. *Commissioner of Correction*, 138 Conn. App. 594, 601, 53 A.3d 1031 (2012). The petitioner claims that the Appellate Court improperly concluded that the habeas court acted within its discretion in denying certification to appeal because he established that his counsel had performed deficiently in failing to call the two witnesses, and further, that had those witnesses testified, there is a reasonable probability that the outcome of his criminal trial would have been different. We need not determine whether the habeas court abused its discretion in denying the petitioner certification to appeal because even if we assume, without deciding, that the habeas court's denial of certification was an abuse of discretion, we conclude that the petitioner has not demonstrated that he is entitled to a new trial. We therefore affirm the Appellate Court's judgment.

The following factual and procedural history is necessary to our resolution of the petitioner's appeal. In 1996, following a jury trial, the petitioner was convicted of murder, conspiracy to commit murder and larceny in the first degree in connection with the killing of the victim, Angel Soto.[2] Because the evidence underlying that conviction is highly relevant to the petitioner's claim that his trial counsel's performance was constitutionally defective, we set forth the facts that the jury reasonably could have found, as recited in the opinion of the Appellate Court in his direct appeal; see *State* v. *Sanchez*, 50 Conn. App. 145, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998); followed by a discussion of the pertinent testimony at the petitioner's criminal trial.

"The [petitioner] had been a member of the Latin Kings gang [in Bridgeport] from approximately 1989 until 1993 when he was expelled for breaking gang rules. He sought help from his cousin, Antonio Rigual, in getting back in the gang. Rigual asked his roommate, Edwardo Ortiz, what the [petitioner] could do to regain his membership in the gang. Ortiz asked Emanuel Roman and Richard Morales, the local gang leaders, for

their advice. Roman and Morales informed Ortiz that the only way the [petitioner] could regain his membership was to kill either Louis Rodriguez, who had had an affair with Roman's wife, or the victim . . . who knew of the affair but [had] failed to report it. Ortiz . . . relay[ed] this information to the [petitioner when] the [petitioner] asked Ortiz how he could regain his membership. Because the [petitioner] did not know the victim, Ortiz pointed him out.

"With the help of others, the [petitioner] stole a red van from Devoe Paints and painted it with brown primer. On the evening of April 8, 1994, the [petitioner], Jesus Valentin and an individual known as 'Black' drove through Bridgeport in the van looking for the victim. They saw the victim leave the Savoy Club and followed his vehicle until it stopped outside a restaurant [named La Familia]. When the van stopped next to the victim's vehicle [at approximately 10:30 p.m.], the [petitioner] and Black shot him repeatedly and fatally." Id., 146–47.

"After the shooting, the [petitioner], Valentin and Black attended Rigual's birthday party, which was [hosted] by Ortiz. The [petitioner] told Ortiz and Rigual that he had just killed the victim. Rigual put his necklace of colored beads on the [petitioner], a sign of gang membership. The day after the murder, Ortiz and [Lester Simonetty, the petitioner's brother] purchased flares, intending to burn the van, [but the van] was recovered [by the Bridgeport police from the Evergreen Apartments] before it was burned.

"During their investigation, the police obtained statements from Ortiz, Valentin and Albert Aponte [an acquaintance of the petitioner], each of whom recounted substantially the same facts about the victim's death." Id., 147. Ortiz had been arrested by federal authorities in New Jersey and, in exchange for leniency, provided information to state and federal authorities about the Latin Kings and various unsolved crimes, including the victim's murder. Id., 151. Around the same time, Aponte, who was being held in Bridgeport on unrelated charges, "spoke with members of the Bridgeport [P]olice [D]epartment about the victim's murder. He . . . [subsequently] gave them a tape-recorded statement, which was transcribed and signed under penalty of perjury." Id. Thereafter, "Valentin was arrested by the Bridgeport police and gave [them] a signed statement, under oath and witnessed by his mother."[3] (Footnote omitted.) Id., 152. The petitioner then was charged with the victim's murder.

At the petitioner's trial, Ortiz testified consistently with the statement that he had given to the police. Specifically, he explained how, in response to a query made by Rigual on the petitioner's behalf, he sought and relayed information from Roman and Morales as to how the petitioner, who had been expelled from the Latin Kings, could gain readmission into the gang. Ortiz

testified that in addition to speaking with Rigual, he personally spoke with the petitioner about the matter, and pointed out the victim to him. Ortiz testified that the petitioner agreed to kill the victim, and did so about one week later, thereafter arriving at Rigual's birthday party sometime between 11 p.m. and midnight to report that the victim was dead. According to Ortiz, Rigual then put his beads around the petitioner's neck, shook his hand and saluted him. Ortiz testified that the birthday party was well attended—that it was "pretty packed" with people.

Ortiz testified further that he spoke with the petitioner again about one week after the murder, at which time the petitioner shared with him additional details about the crime. Specifically, the petitioner informed Ortiz that he had committed the murder with another individual, Black, that they had used a stolen van that was painted with primer, that Valentin had driven the van and that the petitioner had wielded an Uzi while Black fired a .38 caliber weapon. According to Ortiz, the petitioner told him that they had considered killing the victim at the Savoy Club, but there were too many people there, so the petitioner waited in the van, followed the victim when he left that establishment, and then pulled alongside the victim's vehicle and shot him after the victim had stopped and double-parked outside La Familia. Ortiz testified further that on another, subsequent occasion, he had spoken with the petitioner, Black and Valentin together, and they relayed to him the same details about the murder.[4]

Ortiz testified additionally that he had spoken with the petitioner's brother, Simonetty, following the murder, and the two went to buy flares to burn the van at the Evergreen Apartments. They never did so, however, because the van was gone when they returned. Finally, on both direct and cross-examination, Ortiz discussed his cooperation agreement, pursuant to which he expected lenient treatment in his own case in exchange for his testimony.

Valentin and Aponte also were called to testify at trial, but they recanted the earlier statements they had given to the police. Aponte claimed that he had fabricated his statement at Ortiz' direction when Aponte visited Ortiz while he was in federal prison. Valentin acknowledged giving his statement but denied that it was true. Consequently, Aponte's and Valentin's previous statements to police were both admitted into evidence, for substantive purposes, pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and § 8-5 (1) of the Connecticut Code of Evidence.[5]

In Aponte's statement, he explained that Valentin, Black and the petitioner told him details about the murder, in particular, that Valentin was driving the van, that the petitioner shot at the victim with an Uzi, and that

Black brandished a .38 caliber weapon. He relayed specific details of the murder that the three participants had provided to him, namely, that they waited for the victim to leave the Savoy Club in his car, followed him to La Familia, and began shooting at him after he parked. He stated further that Black began shooting first, after which the petitioner opened the side door of the van and joined in the attack. Aponte claimed that the petitioner showed him the Uzi beforehand and told him what he planned to do. He also stated that he was privy to a conversation between Roman and the petitioner in which Roman told the petitioner to commit the murder, that he was present when the petitioner was readmitted into the gang at Rigual's birthday party, and that he witnessed the petitioner and another individual known as "Chino" painting the van that was used in the shooting. According to Aponte, the van was a new Chevrolet, originally painted red, which the petitioner and Chino painted brown. Aponte stated finally that the petitioner and Valentin asked him to help burn the van, which the petitioner told him had been moved to the Evergreen Apartments, but Aponte declined.

Valentin's statement likewise explains that he drove the van used in the victim's murder and that the petitioner killed the victim. According to Valentin, on the night of the murder, the petitioner picked him up in the van and then picked up another "kid" at a different location. That other individual was African-American, skinny and approximately nineteen years old. Thereafter, the petitioner asked Valentin to drive the van. After a while, the petitioner "said that he saw somebody that he didn't like. Then we left and came back later. The guy got into his car and we started to follow him. Then the other guy parked. That's when [the petitioner] told me to stop by the side of him. [The petitioner] and the guy in the passenger side started shooting. I freaked out. I drove away. I drove over the bridge and headed toward Seaside Park. I dropped them off and drove home. I left the van off one of the side streets of Park Avenue. Then I walked home." Valentin elaborated that the three men first saw the victim "[b]y the light at the club," then followed him to La Familia. He explained that the petitioner shot from the side door of the van, using "an Uzi or Mak," and that the young African-American man shot from the passenger door, using a "smaller gun." Valentin stated that the turn of events was a surprise to him, as he was completely unaware the shooting was to occur. When asked whether he had anything to add to his statement, he asserted that he felt he had been tricked, and that he had not said anything earlier because he feared for his life and wanted to go to Puerto Rico.[6]

A number of other witnesses also testified for the state. Ronald Pettway, a friend of the victim, testified that on the night of the murder, he ran into the victim outside the Savoy Club, and the victim agreed to give

him a ride elsewhere. Along the way, the victim asked Pettway to buy him a soda. After the victim double-parked the car, Pettway exited it and had taken a few steps toward a nearby store when he heard gunshots behind him and started to run. Thereafter, he saw a "[b]rown orange" van drive away and turn onto Stratford Avenue.

Anibel Florez, who was standing in the doorway of the La Familia restaurant when the shooting occurred, testified that a car pulled up and double-parked, a man exited from the passenger side, a brown van drove up shortly thereafter, multiple shots were fired from the passenger side of the van at a man seated behind the wheel of the car, and the van then took off toward Stratford Avenue. Jose Rodriguez, who was standing next to Florez in the restaurant, testified similarly. Wilfredo Nieves, a patrolman with the Bridgeport Police Department who was the first officer to arrive at the scene at approximately 10:30 p.m., testified that Rodriguez and Florez both told him that they saw an African-American male shooter, although both men had denied saying so when questioned at trial.

Cozy Shaw, an employee of Devoe Paints, testified that the business' new red Chevrolet van had been stolen the evening before the victim's murder, and later was returned by the police, damaged and painted with brown primer. Daniel Garcia, a Bridgeport police officer, testified that the van, which had a fresh coat of brown primer, was recovered from the Evergreen Apartments after someone reported an abandoned vehicle, early in the afternoon on the day after the victim's murder. Ann Marie Osika, a detective with the Bridgeport Police Department, testified that she processed the crime scene and the van and that both were littered with nine millimeter and .38 caliber bullets, bullet fragments and casings, which she collected and marked. Thomas Gilchrist, a forensic pathologist and associate state medical examiner, testified that he performed an autopsy on the victim, and he described the victim's wounds and the bullets he removed from the victim's body. William Perez, a detective with the Bridgeport Police Department who had viewed the autopsy, described how those bullets were marked and preserved for examination. Edward Jachimowicz, a ballistics expert, testified that the bullets collected during the investigation were fired from two weapons, one a .38 caliber semiautomatic and the other a nine millimeter Uzi.

Michael Kerwin, a Bridgeport police sergeant, testified that he was present when the petitioner was arrested, when he was read and waived his rights, and when he provided a sworn statement. Thereafter, that statement was read into evidence. In the statement, the petitioner attested that, on the evening of the victim's murder, he arrived at Rigual's birthday party, which

was also a birthday party for his mother, at about 6 p.m., and that he left the party with Rigual a little before 2 a.m. The petitioner named several other attendees of the party, including Ortiz, "most of [his] aunts," his brother, Aponte, his mother's friends, "kids from the [neighborhood]" and his grandmother's friend. The petitioner stated that he formerly was a member of the Latin Kings, between 1989 and 1993, but that he had been ousted when someone reported that he was a "snitch," and had not been readmitted. The petitioner denied killing the victim or knowing who did.

At the close of the state's evidence, the petitioner moved for a judgment of acquittal on all charges, claiming that the evidence was insufficient to support a jury finding of guilty on those charges. The trial court denied the petitioner's motion, and he then presented a defense case comprised of four witnesses. Nicole Ouellette, a friend of the petitioner's, testified that she had seen him at Rigual's party the night of the murder, but she could not be specific about the time that she saw him there. Ouellette also stated that, in her view, Ortiz had a reputation for untruthfulness.

Nilda Sanchez, who is the petitioner's mother, testified that she arrived at the party at 9:10 or 9:15 p.m., and left at approximately 1:30 a.m., and that she saw the petitioner there between those times. Nilda Sanchez stated that most of her family, as well as some friends, attended the party.

Pedro Orengo, who is Nilda Sanchez' friend, testified that he, too, arrived at the party between 9 and 9:30 p.m., and left around 11:30 p.m. or midnight. He testified further that he had observed the petitioner at the party during that entire time frame. Orengo agreed that there were a lot of people at the party. He confirmed that he had been contacted only recently by the defense to testify about the party, which had occurred more than one year before.

Finally, the petitioner presented testimony from Melvin Johnson, a federal inmate who, along with several others, had shared a cell with Ortiz for a brief time while they were both in federal custody. Johnson testified that at that time, Ortiz himself bragged about having killed the victim over a drug turf disagreement. According to Johnson, Ortiz stated that he "shot [the victim] with two Maks in both hands," which he had learned to do at the local gun range. Johnson testified that Ortiz told him a van had been used in the murder, and that the incident had occurred outside La Familia. On cross-examination, Johnson acknowledged that he faced then pending felony charges and that he was hoping for leniency as a result of his testimony. Johnson admitted that he was familiar with the murder of the victim before he was incarcerated because he was from the neighborhood where it occurred, and because Pettway, the victim's friend who was with him when he was killed, was

a relative of Johnson's. Johnson did not identify any other participants in the crime, but speculated that someone else must have been driving the van.

To rebut Johnson's testimony, the state called Eyrn Vazquez, another federal inmate who had shared the cell with Johnson and Ortiz. Vazquez testified that Ortiz had not bragged about shooting the victim as Johnson had claimed. He testified further that, although he had charges pending in Rhode Island, he did not expect to gain anything from his testimony, and that he had not known either Ortiz or Johnson prior to sharing a cell with them. Vazquez acknowledged that, in the past, he had been a member of the Latin Kings in Rhode Island.

In its closing argument, the state emphasized that the police had separately interviewed Ortiz, Valentin and Aponte, that all of them had told essentially the same story regarding the victim's murder, and that it was highly unlikely that Ortiz had orchestrated all of that testimony from a jail cell. Further, the state underscored the fact that the story told by the witnesses was consistent with the available forensic evidence, and that there was no apparent motivation for the witnesses to lie or any explanation for why they all would do so in the same fashion. The state also attacked the petitioner's alibi evidence as weak.

The petitioner's trial counsel, Jonathan J. Demirjian, in his closing argument, assailed Ortiz' credibility extensively, arguing that his demeanor as a witness suggested dishonesty, that he initially did not discuss the crime with police when he was arrested and that his testimony was inconsistent with his earlier written statement in that the former was considerably more complete and detailed. See footnote 4 of this opinion. Demirjian argued variously that Ortiz in fact was the perpetrator of the crime, that he had ordered it, or that he simply was privy to the facts and was trying to blame the petitioner to curry favor with authorities.

Thereafter, the jury returned a verdict finding the petitioner guilty of murder, conspiracy to commit murder and larceny in the first degree, and the trial court rendered judgment in accordance with the verdict. The petitioner appealed from the judgment of the trial court to the Appellate Court, claiming, inter alia, that the evidence was insufficient to support his convictions. On August 25, 1998, the Appellate Court issued its opinion rejecting the petitioner's claims and affirming the judgment of the trial court. *State* v. *Sanchez*, supra, 50 Conn. App. 146.

Nearly nine years later, in January, 2007, the petitioner filed a petition for a writ of habeas corpus challenging his conviction. The petitioner alleged that Demirjian had been ineffective for failing to adduce the testimony of Rigual and Simonetty at his criminal trial because, the petitioner claimed, that testimony would

have contradicted the state's contention, presented through the testimony of Ortiz, first, that Rigual had aided the petitioner in gaining readmission into the Latin Kings predicated on the petitioner's willingness to murder the victim, and second, that Simonetty had agreed to assist the petitioner in disposing of the van used in the commission of that murder.[7]

A trial on the habeas petition was held on January 19, 2010, and March 16, 2010. The petitioner presented brief testimony from Simonetty, Rigual and Demirjian. The petitioner himself also testified. The totality of that testimony may be summarized as follows.

Simonetty confirmed that he is the petitioner's younger brother. He testified that around the time of the victim's murder in April, 1994, he did not know Ortiz well, but knew Aponte. He claimed to be unfamiliar with Roman and Morales, and denied that he was a member of the Latin Kings in 1994. Simonetty further denied being party to any discussions with Ortiz or Aponte about the petitioner's interest in regaining membership in the Latin Kings or about the petitioner killing the victim. He similarly denied having such discussions with Roman and Morales. Finally, Simonetty testified that he was not familiar with the victim or the facts and circumstances surrounding his death. On cross-examination, Simonetty acknowledged that he had been convicted of manslaughter in 1996, and had a history of selling drugs.

Rigual acknowledged that he is the petitioner's cousin. He agreed that he knew Ortiz prior to 1994 through "just doing mechanic work and things like that," but denied that he and Ortiz were friends or socialized together.[8] Rigual also acknowledged knowing Aponte, but denied ever hearing of Roman or Morales. He further testified that he was not a member of the Latin Kings in April, 1994, and that around that time, he had no discussions with Ortiz, Aponte, Roman or Morales regarding the petitioner's readmission into the Latin Kings or about the petitioner killing the victim. Rigual also denied knowing or discussing the victim or having any personal knowledge of his death. Moreover, he denied even knowing that the victim had been murdered in April, 1994. On cross-examination, Rigual admitted that he had prior convictions for assaulting a police officer and possession of narcotics.

Demirjian testified strictly from memory because his file in the petitioner's fourteen year old case could not be located. He recalled having heard Simonetty's name, but not specifically in relation to the petitioner's case. He responded similarly when asked whether he remembered Rigual. Demirjian explained that "[t]here [were] a lot of cases like [the petitioner's] around [1995]," that "[a] lot of the names were interchangeable" and that the names of the two men "were prominent around that time."[9] Demirjian testified that his office had investi-

gated the case on behalf of the petitioner, but he had "no recollection" of whether he had sent an investigator to talk to either Simonetty or Rigual or whether he had contacted them personally. He did not recall whether either man had testified at the petitioner's trial, nor could he recall whether there would have been any strategic reason for not calling them.

Finally, the petitioner himself testified that he initially was unaware of Simonetty's or Rigual's alleged involvement in the case, but learned of it sometime during his trial.[10] He stated that, at that point, he asked Demirjian to call Rigual and Simonetty as witnesses. According to the petitioner, he wanted the two men to testify because Ortiz' claims regarding Ortiz' interactions with them were not true.

Following the foregoing testimony and brief argument by counsel, the habeas court issued an oral ruling rejecting the petitioner's claim. The court found that Demirjian's failure to call Rigual and Simonetty was not deficient performance and, even if it were, the petitioner had not shown prejudice. As to deficient performance, the court concluded that there was no reason that Demirjian would or should have called the two men as witnesses. As to prejudice, the court reasoned that the testimony provided by Rigual and Simonetty at the habeas trial concerned only the petitioner's purported motive to commit murder, which is not an element of the crime,[11] and further that, because both witnesses were "convicted felons" with "a motive to be deceptive . . . it [was] doubtful that a jury would have given any real credibility to the testimony had it been presented" at the criminal trial. Thereafter, the habeas court denied the petitioner's request for certification to appeal from the dismissal of his petition. The petitioner's appeal to the Appellate Court followed.

A majority of the Appellate Court panel rejected the petitioner's claim that the habeas court had abused its discretion in denying him certification to appeal. *Sanchez* v. *Commissioner of Correction*, supra, 138 Conn. App. 601. Accordingly, the Appellate Court dismissed the petitioner's appeal. Id. Focusing on the habeas court's conclusion that the petitioner had failed to prove prejudice, the Appellate Court deferred to that court's finding that Rigual and Simonetty lacked credibility as supported by the record and, therefore, was not clearly erroneous. Id., 599–600. It further agreed with the habeas court that the proffered testimony would not have changed the outcome of the petitioner's criminal trial. Id., 600–601.

Judge Sheldon dissented, observing that Ortiz, like Rigual and Simonetty, had an extensive criminal record as well as pending criminal charges, and that testimony from Rigual and Simonetty "would probably have been quite helpful" in undermining the credibility of Ortiz, whose testimony was essential to the state's case. Id.,

605. Judge Sheldon also questioned the habeas court's statement that Rigual and Simonetty had an unspecified "[motive] to be deceptive," characterizing it as a "mere assertion" that did not adequately support the court's ruling in view of the potential significance of the witnesses' testimony.[12] Id. (*Sheldon, J.*, dissenting). This appeal followed.[13]

The petitioner argues that the Appellate Court improperly determined that the habeas court did not abuse its discretion in denying his petition for certification to appeal. According to the petitioner, he provided Demirjian with the names of "two important rebuttal witnesses . . . who . . . would have contradicted the testimony of the state's key witness," Ortiz, and Demirjian, without explanation, failed to call the witnesses at his criminal trial. The petitioner contends that this failure amounted to ineffective assistance of counsel, and that he was prejudiced thereby because, had the witnesses been called, there is a reasonable probability that the outcome of his trial would have been different.[14]

The respondent, the Commissioner of Correction, argues, to the contrary, that the Appellate Court correctly found no abuse of discretion because that court properly held that the habeas court's factual finding that a jury was unlikely to have found Rigual and Simonetty credible was not clearly erroneous. The respondent points out that the two men offered only general denials of gang membership and knowledge of the circumstances of the victim's murder, and their testimony was devoid of specifics that might have lent some credibility to their brief and otherwise unpersuasive version of the facts. Moreover, the respondent argues that the case against the petitioner was not weak, as he suggests, but included the prior statements of Aponte and Valentin, as well as the testimony of Ortiz, which the jury credited despite Ortiz' self-interest in testifying against the petitioner. We agree with the respondent.

"We begin our analysis by setting forth the appropriate standard of review. The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Thus, [t]his court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . .

"Furthermore . . . if either the petitioner or the respondent is denied a timely request for certification to appeal from a habeas court's judgment, such review may subsequently be obtained only if the appellant can demonstrate that the denial constituted an abuse of

discretion. . . . We recognize that [i]n enacting § 52-470 [g], the legislature intended to discourage frivolous habeas appeals. . . . A habeas appeal that satisfies one of the criteria set forth in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), is not, however, frivolous and warrants appellate review if the appellant can show: that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . [I]f an appeal is not frivolous, the habeas court's failure to grant certification to appeal is an abuse of discretion. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria identified in *Lozada* and adopted by this court for determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed." (Citations omitted; internal quotation marks omitted.) *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 448–49, 936 A.2d 611 (2007). In light of our determination, which we explain more fully hereinafter, that the petitioner's ineffective assistance of counsel claim lacks merit because he cannot establish that he was prejudiced by Demirjian's allegedly deficient performance, we need not decide whether the Appellate Court properly determined that the habeas court acted within its discretion in denying the petitioner's request for certification to appeal from the adverse judgment of the habeas court.

We now turn to the well settled legal principles governing the petitioner's claim. "A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, [the petitioner] must demonstrate that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, 308 Conn. 463, 470, 68 A.3d 624, cert. denied sub nom. *Dzurenda* v. *Gonzalez*, U.S. , 134 S. Ct. 639, 187 L. Ed. 2d 445 (2013). Consequently, "[i]t is well settled that '[a] reviewing court can find against a petitioner on *either* ground, whichever is easier.' . . . *Valeriano* v. *Bronson*, 209 Conn. 75, 86, 546 A.2d 1380 (1988); see also *Strickland* v. *Washington*, supra, 697 ('a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant')." (Emphasis in original.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 713, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

Like the Appellate Court, we focus on the prejudice prong of *Strickland* in evaluating the petitioner's claim of ineffective assistance of counsel. "In making [the prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or the jury." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 688–89, 51 A.3d 948 (2012). "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. . . . The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Citations omitted; internal quotation marks omitted.) Id., 689.

We begin by emphasizing that the criminal case against the petitioner was not, as he contends, a weak one that was entirely dependent on the testimony of Ortiz, who, because he had agreed to cooperate with the state to gain leniency in his own criminal case, had reason to falsely implicate the petitioner. Rather, *three* individuals, one of whom was an eyewitness to, and an apparently unwitting participant in, the victim's murder, provided essentially the same detailed account of the crime and the surrounding facts and circumstances, and that account meshed neatly with the available physical evidence and the testimony of other, disinterested witnesses.[15] Importantly, moreover, nothing that any of the men said about the crime contradicted what the others said in any significant respect.

Specifically, Ortiz, Aponte and Valentin each provided information about the crime based on their varying roles in the matter and, consistent with the differing

nature of their involvement, each gave certain details not supplied by the other two. At the same time, however, each also conveyed the same core facts about the murder: that it was committed by the petitioner and Black, while Valentin drove, in a recently stolen, repainted van; that the petitioner had used an Uzi, firing from the van's side door, and Black had wielded a smaller weapon, firing from the passenger seat; that the men had followed the victim from the Savoy Club to La Familia, attacking him after he had stopped and double-parked; and that the van, soon thereafter, was moved to the Evergreen Apartments. These details matched the ballistics evidence presented by the state, Pettway's explanation of where he and the victim had been shortly before the crime, the descriptions of the shooting provided by Pettway, Florez and Rodriguez, and police testimony regarding the recovery and condition of the van. In short, the consistency of the three men's accounts, all of which were also consistent with the other evidence, combined to establish a strong case against the petitioner. Furthermore, the fact that the accounts were similar, but not identical, and at the same time did not contain any irreconcilable contradictions, made it highly unlikely that they were a coordinated fabrication, as the petitioner now suggests.

Additionally, although the petitioner attempted to refute the state's case with alibi and third party culpability evidence, that evidence was not especially compelling and, not surprisingly, it was discredited by the jury. As to the petitioner's alibi, various witnesses' testimony, and the petitioner's own statement to police, indicated that the party at which the petitioner claimed to be at the time of the murder was well attended by a large number of the petitioner's friends and relatives, yet very few of the guests appeared to attest to his presence there. Moreover, those who did appear, such as the petitioner's mother, testified only vaguely that they saw him throughout a general time frame, and could not state definitively that he was present at the party at the specific time that the murder had occurred. Regarding third party culpability, the petitioner, relying largely on rumor, innuendo and the testimony of Johnson— testimony that was contradicted by the ballistics evidence—further attempted to persuade the jury that Ortiz himself had killed the victim. In the end, however, the jury was unconvinced.

It is against this backdrop that we review the testimony presented by the petitioner at his habeas trial to determine whether there is a reasonable probability that, had it been presented at his criminal trial, the result of that criminal trial would have been different. Turning first to Simonetty, we have no difficulty in concluding that his testimony would not have changed the outcome of the criminal trial, even if the jury had found it to be credible. First, most of Simonetty's testimony did not conflict with the evidence presented at

the petitioner's criminal trial. In particular, neither Ortiz nor any other witness testified that Simonetty was privy to any conversations with Roman, Morales, Ortiz or Aponte as to how the petitioner could gain readmission into the Latin Kings gang and, consequently, his testimony in that regard would have been of no moment. Second, although Simonetty's assertion that he was not a member of the Latin Kings and was unfamiliar with the victim and the facts and circumstances surrounding his death is contrary to Ortiz' testimony that he and Simonetty had planned to burn the van used in the crime, that assertion does not directly refute the evidence of the petitioner's participation in, or motive to commit, that crime. Rather, assuming that Simonetty's testimony would have been believed had Demirjian presented it, it would have undercut Ortiz' testimony on a peripheral and ultimately inconsequential matter, that is, a planned disposition of the van that never actually occurred.

We turn next to the testimony of Rigual. In contrast to Simonetty's testimony, Rigual's testimony bore on a more significant matter, namely, the petitioner's motive to murder the victim. Although, as the habeas court recognized, evidence of motive is unnecessary to establish the elements of the crimes charged, such evidence nevertheless is important, and proving a motive is likely to strengthen the state's case. *State* v. *Wilson*, 308 Conn. 412, 430, 64 A.3d 91 (2013). Evidence of motive, like all of the other evidence in the case, must be weighed by the jury. Id. "The role motive plays in any particular case necessarily varies with the strength of the other evidence in the case. The other evidence may be such as to justify a conviction without any motive being shown. [Alternatively] [i]t may be so weak that without a disclosed motive the guilt of the accused would be clouded by a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Harris*, 182 Conn. 220, 224, 438 A.2d 38 (1980).

Although Rigual's testimony at the habeas hearing concerned motive, a potentially important matter, we nevertheless conclude that there is no reasonable probability that his testimony would have changed the outcome of the petitioner's criminal trial. As we previously have explained, the state's case against the petitioner was relatively strong. Three separate witnesses, including an eyewitness participant, provided consistent accounts of the petitioner's actual commission of the crime and his account of it thereafter, and that account, which was credited by the jury, was supported by other evidence presented by the state.

Furthermore, and perhaps most important, the habeas court concluded that a jury was unlikely to have found Rigual credible, and we agree with the Appellate Court that the habeas court's finding in this regard is not clearly erroneous.[16] First, as a relative of the

petitioner, Rigual was hardly a disinterested witness; rather, his relationship to the petitioner provided him with a strong motive to testify in a manner helpful to the petitioner. Second, Ortiz, Aponte and Valentin each provided substantive, detailed and consistent statements regarding the murder and the surrounding circumstances, while Rigual issued only a summary denial of any knowledge of or connection to the crime.[17] Third, Rigual's claim that he was only casually acquainted with Ortiz was unlikely to be believed, as it was unaccompanied by any refutation of Ortiz' testimony that the two men were roommates, and that Ortiz had hosted a large birthday party for Rigual on the night of the murder. Fourth, as the habeas court intimated, because Ortiz had implicated Rigual in gang membership and involvement in a serious crime, Rigual's denial of the truth of Ortiz' testimony would be an expected response, whether truthful or not.[18] Fifth, although the petitioner claimed that he was at Rigual's birthday party for the entire evening on which the murder occurred and that the two men had driven home from the party together, Rigual offered no testimony in support of that alibi. Finally, the habeas court was in the best position to observe Rigual's conduct, demeanor and attitude while testifying, and that court explicitly found him not credible.[19]

The petitioner nevertheless contends that the testimony he presented at the habeas hearing was crucial evidence that would have undermined Ortiz' credibility and, had it been adduced at his criminal trial, the jury likely would have disbelieved Ortiz. After reviewing the record of the criminal trial, we are not persuaded. As a general matter, the jury was fully aware of Ortiz' bias and his potential motivation to lie. He was subject to rigorous cross-examination, a general attack on his veracity by a friend, Ouellette, and an accusation by Johnson, his former cellmate, that he had taken credit for the victim's murder. Demirjian focused his closing argument on Ortiz' lack of veracity and accused him of committing the crime. Still, the jury found Ortiz credible. In light of the foregoing, we are not convinced that there is a reasonable probability, had the jury also heard Rigual's and Simonetty's rather cursory and self-serving denials of their alleged involvement in the matter—denials that the habeas court found to be not credible—that the result would have been different.

In support of his claim, the petitioner relies on this court's opinions in *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009), and *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 664. In each of those cases, we concluded that the habeas court properly had determined that the habeas petitioner's trial counsel had rendered ineffective assistance by failing to call certain witnesses during the petitioner's criminal trial.

*Gaines* v. *Commissioner of Correction*, supra, 678–79; *Bryant* v. *Commissioner of Correction*, supra, 503–504. Both cases, however, are readily distinguishable from the present case. In *Bryant*, a jury convicted the petitioner, Bernale Bryant, of manslaughter in the first degree after crediting the state's evidence that he had dragged two men from their car and beat them, one of them fatally, because the men had failed to pay him in connection with a drug deal. *Bryant* v. *Commissioner of Correction*, supra, 504–505.

In his subsequent habeas petition, Bryant alleged that his trial counsel was ineffective for failing to present a third party culpability defense predicated on the testimony of four witnesses, namely, the driver of the car that struck the victims' car, two emergency medical technicians who arrived shortly thereafter and the girlfriend of the surviving victim, with whom that victim had spoken shortly after the incident. Id., 506. At the habeas trial, the driver of the other vehicle testified that, shortly before the collision, he had heard gunshots; that a second car was pursuing the victims' car; that a Hispanic man,[20] carrying something in his hand, exited the second car after the collision and looked into the victims' car before departing; and that at no time had he witnessed the victims being pulled from their vehicle and beaten. Id., 507–508. Both emergency medical technicians testified that, upon arriving at the scene, they noticed what appeared to be a gunshot wound to the deceased victim's head. Id., 508. Finally, the girlfriend of the surviving victim testified that that victim, shortly after the incident, reported to her that "there had been an incident with three Hispanic males and a gun." (Internal quotation marks omitted.) Id.

After hearing the four witnesses' testimony, the habeas court in *Bryant* found their credibility to be " 'considerable and compelling' because all four were neutral witnesses who were not meaningfully impeached at the habeas hearing,"[21] and, upon concluding that both prongs of *Strickland* had been met, granted the petition. Id., 510–11. In holding that the Appellate Court improperly had reversed the judgment of the habeas court, we observed that the habeas court reasonably found that the petitioner's witnesses were neutral and credible, and that their testimony, which was fully consistent with statements they had made contemporaneous to the events in question, provided a firm basis for a convincing third party culpability defense, which, we explained, "likely would have permeated to some degree every aspect of the [criminal] trial and raised a reasonable doubt in the minds of the jury as to the petitioner's guilt." Id., 523. We also noted the dubious credibility of the state's eyewitnesses,[22] concluding that the testimony presented by Bryant at the habeas trial "would have called into question the most basic elements of the state's case: (1) that [Bryant] was the individual who killed [the victim]; and (2) that

[the victim] died as a result of a beating." Id., 520.

In *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 666–67, the petitioner, Norman Gaines, was convicted of capital felony, murder and conspiracy to commit murder in connection with the shooting deaths of two people. The state's trial evidence consisted, in part, of the testimony of two individuals who claimed that Gaines had access to the type of weapons used in the incident and that he had taken credit for the crime. Id., 668. Gaines testified in his own defense, denying that he was involved in the murders and claiming that he had a prior dispute with the two state's witnesses, who were lying in an effort to frame him. Id., 669, 674.

After he was convicted, Gaines filed a habeas petition claiming that his trial counsel had been ineffective for failing to interview and call two witnesses who could have provided an alibi defense for him on the night of the murders. Id., 669–70. Both of those witnesses appeared at the habeas trial and testified that, on that evening, Gaines had helped one of them move to a new apartment. Id., 671–73. They provided detailed and consistent information as to the timetable of the move and Gaines' participation in it, including the fact that he did not leave at any time that evening, and they offered reasonable explanations for why they had not come forward sooner. Id.

The habeas court in *Gaines* granted the petition after finding, inter alia, that the proffered testimony was "credible and compelling" and "would have served as a substantial counterweight to the evidence of guilt presented at trial" that likely would have affected the verdict. (Internal quotation marks omitted.) Id., 675–76. On appeal, this court agreed with the habeas court that the alibi evidence, had it been introduced, likely would have created a reasonable doubt as to Gaines' guilt and caused the jury to return a different verdict. Id., 688. We relied heavily on the fact that the habeas court had found the witnesses credible, despite other evidence the state contended would have been used to impeach them. Id., 690–91. We observed further that the state's case against Gaines was not particularly strong, and that the alibi evidence would have undermined the testimony of the state's primary witnesses, who were otherwise uncontradicted, on the seminal question of whether Gaines had committed the murders. Id., 691–92.

As the foregoing summaries make clear, although *Bryant* and *Gaines* both involved ineffective assistance of counsel claims predicated on trial counsel's failure to call certain witnesses, they bear little other similarity to the petitioner's case. First and foremost, in each of those cases, the habeas court expressly found that the proffered witnesses were compelling and credible. Additionally, those witnesses were neutral, uninvolved parties who either provided their accounts contempora-

neously with the crime at issue, or gave a sound and credible reason for not having done so. Here, in stark contrast, the habeas court found Rigual and Simonetty *not* credible, a finding that is amply supported by the evidence. Moreover, in addition to the fact that both Rigual and Simonetty are related to the petitioner, the state's evidence implicated both of them, albeit somewhat peripherally, in the crime itself. Consequently, they cannot be characterized as impartial or disinterested witnesses. In addition, they apparently did not come forward with their exculpatory testimony until approximately fourteen years after the crime. Finally, aside from issues of credibility, the substance and quality of the testimony offered by the two men differs significantly from that provided by the witnesses in *Bryant* and *Gaines*: unlike the testimony in those cases, the testimony of Rigual and Simonetty was not particularly detailed, and it did not directly concern the ultimate issues in the case, such as whether the charged crime actually occurred, whether a third party instead of the petitioner committed the crime or whether the petitioner could not have committed the crime because he was elsewhere when it occurred.

"As we have previously indicated, to satisfy the prejudice prong—[to show] that his trial counsel's deficient performance prejudiced his defense—[a habeas] petitioner must establish that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . The petitioner must establish that, as a result of his trial counsel's deficient performance, there remains a probability sufficient to undermine confidence in the verdict that resulted in his appeal. . . . In order to demonstrate such a fundamental unfairness or miscarriage of justice, the petitioner should be required to show that he is burdened by an unreliable conviction." (Citations omitted; internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 101–102, 52 A.3d 655 (2012). In the present matter, the petitioner failed to make this showing. For that reason, we agree with the Appellate Court that the habeas court properly dismissed the petitioner's application for a writ of habeas corpus alleging ineffective assistance of counsel.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] General Statutes § 52-470 (g) provides in relevant part: "No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried . . . to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

We note that § 52-470 has been amended since the time the petitioner filed his appeal from the habeas proceeding; see Public Acts 2012, No. 12-115, § 1; by the addition of several new subsections and the recodification of the previously existing subsections. What was previously codified as § 52-470 (b) is currently codified as § 52-470 (g), with no language changes. For purposes of convenience, we refer to the current revision of the statute.

[2] The petitioner received a total effective sentence of sixty years imprisonment.

[3] At the time he gave his statement, Valentin was seventeen years old.

[4] Throughout his cross-examination of Ortiz and subsequent closing argument, the petitioner's trial counsel attempted to persuade the jury that Ortiz' trial testimony was inconsistent with his earlier statement to police. Although the testimony included more and different information than did the statement, it did not directly contradict the statement. Specifically, in his written statement, Ortiz described a conversation that he had had with Black alone in which Black relayed to him the details of the murder. Those details are entirely consistent with those that Ortiz, at trial, testified that the petitioner had provided him during other conversations. On redirect examination, Ortiz clarified that on three separate occasions, he had spoken about the murder with, respectively, the petitioner individually, Black individually, and the petitioner, Black and Valentin together. Ortiz testified further that, when he gave his statement to the police, he informed them that he had first heard of the murder from the petitioner, and then from Black.

[5] See footnote 15 of this opinion.

[6] Valentin initially was charged in connection with the victim's murder, but those charges were dismissed before he was called to testify at the petitioner's trial. The jury was made aware of that circumstance.

[7] The petitioner also alleged that Demirjian had been ineffective for failing to present the testimony of Morales and Roman, the local Latin Kings gang leaders who allegedly had ordered the killing of the victim, but he failed thereafter to submit any evidence or argument in support of those allegations. Accordingly, they have been abandoned.

[8] In contrast, at the petitioner's criminal trial, Ortiz repeatedly testified that in 1994, he was Rigual's roommate and that, on the night of the victim's murder, he had hosted the birthday party for Rigual. That testimony was not contested at the criminal trial.

[9] According to Demirjian, "[t]here were a lot of Latin King[s] cases or alleged Latin King[s] cases around the mid-90s and a lot of names were being thrown around. There was a big federal case going on at the time. There were several cases going on in the Bridgeport courthouse for a three or four year period that seemed to revolve around the same twenty, twenty-five names [that] kept coming up. Did they come up specifically in this case? They may have. . . . I couldn't say no, I couldn't say yes. But they . . . were familiar to me around the same time."

[10] The petitioner first testified on direct examination that he learned of Simonetty's and Rigual's alleged involvement in the crime when Demirjian gave him some unspecified "statements," then he claimed that the information came from Aponte, who was able to "slip" him some papers when the petitioner was in lockup. On cross-examination, the petitioner testified that Simonetty's and Rigual's names came up for the first time during Ortiz' trial testimony.

[11] Specifically, the habeas court stated that, "the best that Simonetty and Rigual could have established in this case is motive for [the petitioner] to have committed the crimes for which he was found guilty by the jury, and as is well known, motive is not an element of the crime." As we explain more fully hereinafter; see footnote 12 of this opinion; in light of the substance of the two men's testimony, we conclude that the trial court misspoke when rendering its oral decision, and instead intended to indicate that the most that testimony would have demonstrated, if credited, was the petitioner's *lack of* motive.

[12] Additionally, in Judge Sheldon's view, the habeas court improperly had concluded "that [Rigual's and Simonetty's] testimony would have hurt the petitioner's defense by giving him a motive to murder [the victim] . . . ." *Sanchez* v. *Commissioner of Correction*, supra, 138 Conn. App. 604 (*Sheldon, J.*, dissenting). According to Judge Sheldon, that conclusion was "unfounded" because the testimony actually would have contradicted Ortiz' testimony and the state's theory of the case. Id., 604–605 (*Sheldon, J.*, dissenting). We agree with Judge Sheldon that, in light of the substance of Rigual's and Simonetty's testimony at the habeas trial, such a conclusion simply does not make sense. We also agree with the Appellate Court majority, however, that Judge Sheldon's interpretation of the habeas court's decision, in this regard, is inaccurate. As the majority opinion explains, although the habeas court's oral decision may have been worded inartfully, it is more reasonably read as expressing the court's rationale that the proffered testimony would have gone only to the question of motive and *undermined* the state's theory as to that issue. Id., 597 n.4.

Finally, Judge Sheldon contended that, in criticizing the habeas court's reasoning with respect to its conclusion that neither Rigual nor Simonetty

would have been a persuasive witness, he was not improperly revisiting that court's credibility determinations. Id., 605 n.2 (*Sheldon, J.*, dissenting). In support of this assertion, Judge Sheldon explained that the habeas court did not actually make such determinations but, rather, was assessing the likelihood that a jury would have believed Rigual and Simonetty had they testified at the petitioner's criminal trial. Id., 605–606 n.2 (*Sheldon, J.*, dissenting). Like the Appellate Court majority, we are not convinced that this is a distinction with any difference. Id., 601 n.6.

[13] We granted the petitioner's request for certification to appeal from the judgment of the Appellate Court, limited to the following question: "Did the Appellate Court correctly conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal insofar as the Appellate Court examined the petitioner's underlying claim of ineffective assistance of counsel and found the habeas court's factual finding not to be clearly erroneous?" *Sanchez* v. *Commissioner of Correction*, 307 Conn. 951, 58 A.3d 976 (2013) (setting forth certified question as modified upon grant of Commissioner of Correction's motion to reconsider and modify certified question as originally stated; see *Sanchez* v. *Commissioner of Correction*, 307 Conn. 939, 56 A.3d 949 [2012]).

[14] The petitioner also argues that Demirjian failed personally to contact Rigual and Simonetty, or to direct an investigator to do so, for the purpose of evaluating their testimony. The petitioner did not raise this claim in the habeas court; his claim of deficient performance, rather, was predicated solely on Demirjian's failure to call the two men as witnesses. Because the petitioner's claim of an inadequate investigation was raised for the first time on appeal, we decline to review it. We note, moreover, that the record of the proceedings in the habeas court does not support the claim that Demirjian failed to conduct an investigation to determine whether Rigual and Simonetty might have information helpful to the defense. Neither of the two men testified, for example, that they were not contacted by the defense, and Demirjian testified that an investigation was conducted, but he could not recall the specifics of that investigation.

[15] We disagree with the petitioner's suggestion that the statements of Aponte and Valentin were not believable because they subsequently were recanted, and that they should be disregarded when evaluating the strength of the state's case against him. Although out-of-court statements offered to prove the truth of their contents ordinarily constitute inadmissible hearsay, "[i]n *State* v. *Whelan*, supra, 200 Conn. 753 . . . we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 641–42, 945 A.2d 449 (2008). "In addition to signed documents, the *Whelan* rule [which is codified at § 8-5 (1) of the Connecticut Code of Evidence] also is applicable to tape-recorded statements [such as Aponte's] that otherwise satisfy its conditions." Id., 642.

"The *Whelan* hearsay exception applies to a relatively narrow category of prior inconsistent statements . . . [and was] carefully limited . . . to those prior statements that carry such substantial indicia of reliability as to warrant their substantive admissibility." (Internal quotation marks omitted.) Id. Like statements admitted pursuant to other hearsay exceptions, *Whelan* statements are "admissible to establish the truth of the matter asserted [within them] because [they fall] within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment. Thus, as with all other admissible nonhearsay evidence, we allow the fact finder to determine whether the hearsay statement is credible upon consideration of all the relevant circumstances." Id., 642–43.

The statements at issue were signed, sworn and consistent with the other evidence presented at trial. Although at trial, Aponte testified that his statement was false and that Ortiz had directed him to provide it, the jury apparently disbelieved him. As to Valentin, there was no evidence suggesting that Ortiz had influenced him in similar fashion. Moreover, Valentin's statement, insofar as it directly implicated Valentin himself in the crime, bore particular indicia of reliability. Cf. *State* v. *DeFreitas*, 179 Conn. 431, 448–49, 426 A.2d 799 (1980) (recognizing that otherwise trustworthy or corroborated statement against penal interest provides considerable assurance of reliability). In sum, the jury, after considering all of the relevant circumstances, reasonably found Valentin's and Aponte's statements to be credible and their recantations to be false.

[16] Like Judge Sheldon in his dissent, we agree with the petitioner that the fact that a witness has a criminal background does not necessarily render his or her testimony not credible. See *Sanchez* v. *Commissioner of Correction*,

supra, 138 Conn. App. 605–606 n.2. As we explain hereinafter, however, the habeas court's finding that Rigual would not have been found credible by a jury is amply supported by the record and, therefore, not clearly erroneous. Although the habeas court, in its oral ruling, focused on Rigual's criminal record, we nevertheless may presume, in the absence of any indication to the contrary, that the court considered all of the evidence when assessing his credibility. See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 690–91.

[17] For the most part, Rigual's answers to the questions posed of him at the habeas trial consist of one word responses, without elaboration.

[18] As we previously have noted, in finding that Rigual and Simonetty lacked credibility, the habeas court referred to their "motive to be deceptive . . . ."

[19] Quite apart from the credibility of Rigual and Simonetty, we agree with the state that the petitioner also failed to establish that, had Rigual and Simonetty been called to testify at his criminal trial, they would have done so rather than invoke their privilege against self-incrimination, an option that would have been very appealing in light of the state's evidence implicating them in the events surrounding the victim's murder. Indeed, neither Rigual nor Simonetty testified that he would have appeared and given his version of events at the petitioner's trial, had he been asked. Thus, this is not a case in which potential witnesses came forward with information before or during a criminal trial, but were turned away by defense counsel. In fact, it is not clear whether either man, both of whom are related to the petitioner, appeared voluntarily even at the petitioner's habeas trial, as the record reflects that Rigual's and Simonetty's presence was secured by subpoena.

[20] Bryant is African-American. *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 507 n.4.

[21] "Specifically, the habeas court stated, '[a]t this point, the court needs to comment upon the credibility of the four missing witnesses. In brief, it is considerable and compelling. All four of these individuals are law-abiding citizens; there was no meaningful impeachment of their testimony at the habeas trial; and, none of the witnesses knew or were in any way acquainted or associated with the petitioner. They are completely disinterested, observant, qualified and dispassionate witnesses. All of them have appropriate training that would allow them to make the statements that they did. This court, being in the best position to judge the credibility of the proffered witnesses, believes that a jury likewise would have found their testimony to be credible and highly persuasive." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 511 n.6.

[22] The state's eyewitnesses were the surviving victim, who was highly intoxicated at the time of the offense and admitted that he had lied to police officers investigating the incident, and an individual who did not make a statement until four years later during an interrogation following his unrelated felony arrest. *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 519. The two witnesses gave inconsistent statements as to whether Bryant had beaten both victims or only the deceased victim. Id., 519, 525. Additionally, the second witness was only fourteen years old at the time of the incident, and he admitted that he was under the influence of marijuana. Id., 524.